Beverly **PFEFFER**, individually and on behalf of all other similarly situated, Plaintiff Below Appellant,

v.

Sumner M. **REDSTONE**, George S. Abrams, David R. Andleman, Joseph A. Califano, Jr., William S. Cohen, Philippe P. Dauman, Alan C. Greenberg, Jan Leschly, Shari Redstone, Frederic V. Salerno, William Schwartz, Patty Stonesifer, Robert D. Walter, National Amusement, Inc., John F. Antioco, Richard J. Bressler, Jackie M. Clegg, Michael D. Fricklas, Linda Griego, John L. Muething, and CBS Corp. (f.k.a. Viacom, Inc.), Defendants Below Appellees.

No. 115, 2008.

Supreme Court of Delaware.

Submitted: Oct. 29, 2008.
Decided: Jan. 23, 2009.

Jay W. Eisenhofer (argued), Michael J. Barry, and Cynthia A. Calder, Grant & Eisenhofer, P.A., Wilmington, Delaware for appellant.

Jon E. Abramczyk and John P. DiTomo, Morris, Nichols, Arsht & Tunnell LLP., Wilmington, Delaware; Stuart J. Baskin, pro hac vice (argued) for appellees.

Anthony G. Flynn and Mary F. Dugan, Young Conaway Stargatt & Taylor LLP., Wilmington, Delaware for amicus curiae.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices constituting the Court en banc.

STEELE, Chief Justice.

Appellant, Beverly Pfeffer, appeals the Court of Chancery's dismissal of her claims with prejudice under Rule 12(b)(6) for failure to state a claim. Pfeffer brought a class action against the directors of Viacom and Blockbuster and against two corporations, National Amusements, Inc. (NAI) and CBS Corporation.[1] Pfeffer asserts that the Vice Chancellor erred because she sufficiently pleaded, in connection with two transactions, that the Viacom board of directors had breached their fiduciary duties of disclosure, loyalty, and care and that NAI had breached its duty of loyalty.[2] Because we conclude that Pfeffer failed to plead that the alleged disclosure violations were material, the Court of Chancery's judgment of dismissal is **AFFIRMED.**

### FACTS AND PROCEDURAL HISTORY[3]

This dispute arises from two transactions that resulted in Viacom divesting it-

---

1. The defendants in this matter are: Sumner Redstone, Chairman and CEO of Viacom, Chairman of NAI, and Director of Blockbuster; George Abrams, Director of NAI and Viacom; David Andelman, Director of Viacom; Joseph Califano, Director of Viacom; William Cohen, Director of Viacom; Philippe Dauman, Director of NAI, Viacom, and Blockbuster; Alan Greenberg, Director of Viacom; Jan Leschly, Director of Viacom; Shari Redstone, Director of Viacom; Frederic Salerno, Director of Viacom; William Schwartz, Director of Viacom; Patty Stonesifer, Director of Viacom; Robert Walter, Director of Viacom; and NAI. The members of the Blockbuster board of directors were also named defendants in the complaint, however, those defendants (except for Redstone and Dauman) are not parties to this appeal.

2. Pfeffer does not address the alleged duty of care breach other than to state one, so neither do we.

3. The facts restated herein are derived from the well-pleaded allegations of the complaint and documents incorporated therein by reference.

self of its controlling interest in Blockbuster. As of September 2004, Sumner Redstone owned a controlling stake in NAI, which, in turn, owned a 71% voting interest in Viacom. Viacom owned approximately 82.3% of the equity value and 95.9% of the voting power in Blockbuster, a Delaware corporation. The two challenged transactions are: (1) a special $5 dividend paid to Blockbuster stockholders (the Special Dividend); and, (2) a later offer to Viacom stockholders to exchange their Viacom stock for Blockbuster stock (the Exchange Offer).

Believing Blockbuster would perform better as an independent entity, Viacom announced, on February 10, 2004, its intention to spin off 81.5% of its interest in Blockbuster. In a June 18, 2004 press release, Viacom and Blockbuster announced their preliminary divestiture plans. Before the Exchange Offer, Blockbuster would issue a Special Dividend. Thereafter, in a voluntary exchange offer, Viacom shareholders would exchange their Viacom shares for Blockbuster shares. In the press release, Viacom CEO Redstone and Blockbuster CEO John Antioco endorsed the proposed separation. Redstone stated that, after the transaction, "Viacom will devote all its energies and resources into expanding core areas, particularly the content creation engine that we believe will drive our future growth." Antioco announced: "we believe that by becoming a separate company we will be better able to pursue our retailing strategy."

An independent special committee of the Blockbuster board of directors approved the Special Dividend, which would be payable September 3, 2004 as a pro rata special cash dividend of $5 per share.[4] Of the Special Dividend, Viacom received over $738 million of the $905 million distributed to Blockbuster stockholders.[5]

On September 8, 2004, Viacom issued a press release disclosing the final terms of the voluntary Exchange Offer. A Prospectus outlining the relevant terms of the Exchange Offer soon followed. In the Exchange Offer, each tendering holder of Viacom stock would receive 5.15 shares of Blockbuster stock in exchange for each Viacom share tendered.[6] Viacom disclosed that it would accept up to an aggregate of 27,961,165 shares of Class A and Class B common stock until the closing date on October 5, 2004. The Prospectus disclosed that (a) NAI would not participate in the Exchange Offer; (b) several potential risks were associated with acquiring Blockbuster stock, including Blockbuster's potential inability to operate with the increased debt imposed by the Special Dividend; (c) a special committee of the Blockbuster board, comprised of three independent directors, had recommended that the entire Blockbuster board approve the Special Dividend and the Exchange Offer; (d) the special committee had approved the final terms of the divestiture; and (e) neither Viacom nor Blockbuster made a recommendation to stockholders about the Exchange Offer.[7] Nor did the Prospectus

4. The special committee resolved to recommend the Special Dividend to the full Blockbuster board; however, the Committee did not recommend whether or not any stockholder should participate in the Exchange Offer.

5. Blockbuster financed the distribution with newly issued debt.

6. For each share of Viacom stock tendered, a stockholder received 2.575 shares of Blockbuster Class A Common Stock and 2.575 shares of Blockbuster Class B Common Stock.

7. The Prospectus stated: "Neither Viacom nor Blockbuster, nor any of their respective directors or officers, nor the co-dealer managers, makes any recommendation as to wheth-

disclose the composition of the special committee.

Pfeffer and many other Viacom stockholders, but not including Redstone or NAI, tendered their shares in the fully subscribed Exchange Offer.

Following the Exchange Offer, Blockbuster struggled to remain profitable. On March 9, 2006, Blockbuster announced a restatement of its reported cash flows for the years 2003 through 2005. After months of discussions with the SEC, Blockbuster accounted for its new releases in its rental library as current assets, as opposed to their earlier classification as noncurrent assets. As a result of this restatement, Blockbuster categorized those assets as operational expenses instead of capital expenses.

Pfeffer brought a class action in the Court of Chancery on behalf of all former Viacom shareholders who tendered their shares in the Exchange Offer, and on behalf of all Blockbuster shareholders who held shares as of the August 27, 2004 record date for the Special Dividend issued by Blockbuster.[8] Pfeffer named 21 defendants in his complaint, including two corporations, NAI and CBS, and several Viacom and Blockbuster directors.[9]

Pfeffer claimed that the Viacom board of directors had violated their duty of disclosure in relation to the Exchange Offer.[10] Specifically, Pfeffer alleged that the Viacom directors either failed to disclose, or made material misstatements regarding, the true state of Blockbusters' operational cash flow, the methodology used to determine the exchange ratio, and the composition of the Viacom special committee that recommended the transaction to the Viacom board. Pfeffer asserted that the Viacom board of directors knew or should have known that a Blockbuster treasury department manager had compiled a cash flow analysis seven months before the Exchange Offer, and that knowledge demonstrated that Blockbuster's operational cash flow could not support the Special Dividend or Exchange Offer.[11] In her complaint, Pfeffer pointed to several Blockbuster announcements, including Blockbuster's cash flow restate-

er you should participate in the exchange offer. You must make your own decision after reading this document and consulting with your advisors."

**8.** Pfeffer filed the initial complaint on August 3, 2006, almost two years after the challenged transactions. Pfeffer filed the amended complaint on January 12, 2007. The amended complaint will be throughout this opinion as the "complaint."

**9.** *See* n. 1 and accompanying text.

**10.** This case was not the only litigation filed concerning the challenged transactions. First, on February 10, 2004, the day that Viacom announced its proposed divestiture of Blockbuster, a stockholder filed suit in the Court of Chancery seeking injunctive relief. The plaintiff later abandoned the action. Second, on September 16, 2004, one week after the Prospectus detailing the Exchange Offer was disseminated, another shareholder filed a class action in the Court of Chancery seeking a preliminary injunction. The Vice Chancellor denied the plaintiff's application, and the plaintiff voluntarily dismissed the action. Third, on November 10, 2005, a stockholder filed a class action suit in the United States District Court for the Northern District of Texas. On August 22, 2007, the federal judge dismissed the securities laws claims, including similar disclosure claims, with prejudice. *See Congregation Ezra Sholom v. Blockbuster, Inc.*, 504 F.Supp.2d 151 (N.D.Tex.2007). Finally, on November 16, 2005, a stockholder participant in the Blockbuster Investment Plan filed a class action in federal court in New York alleging ERISA fiduciary violations.

**11.** Pfeffer asserted in her complaint that a Blockbuster Senior Vice President "told subordinates not to worry about the cash flow analysis."

ment, as evidence that the Viacom and Blockbuster directors knew or should have known of Blockbuster's financial woes at the time they caused the Prospectus to be disseminated. Although Pfeffer attempted to establish that the directors knew or should have known of Blockbuster's financial problems, she did not allege that the announced restatement caused a market price decline for Blockbuster stock. Pfeffer also claimed that NAI and the directors had breached their duty of loyalty.

All the defendants moved to dismiss the action for failure to state a claim. On February 1, 2008, the Vice Chancellor dismissed all of Pfeffer's claims with prejudice.[12] The Vice Chancellor held that the Viacom Directors had made neither material omissions nor materially misleading statements in the Prospectus. Therefore, the complaint failed to allege a cognizable duty of loyalty violation. Because the Vice Chancellor held that NAI did not control the conduct of the Viacom Directors in the transactions, NAI did not breach its duty of loyalty either.

In this appeal, Pfeffer only appeals the Court of Chancery's dismissal of the first four counts of her complaint.[13] Those four counts allege that the Viacom directors breached their fiduciary duties of loyalty, care, and disclosure and that NAI breached its fiduciary duty of loyalty by making false misstatements or material omissions in documents distributed before the Ex-

change Offer. Pfeffer claims that because of Redstone's and NAI's financial interest in Viacom, the conduct complained of should have been reviewed under an entire fairness standard, thereby precluding a Rule 12(b)(6) dismissal.

## ANALYSIS

We review dismissals under Court of Chancery Rule 12(b)(6) *de novo*.[14] This Court, like the Court of Chancery, is required to accept well pleaded allegations as true and draw reasonable inferences in favor of the plaintiff.[15] Nevertheless, we need not accept conclusory allegations as true and accept only truly reasonable inferences.[16] Pfeffer challenges the Vice Chancellor's determination that her allegations were conclusory and not well pleaded.

### I. Pfeffer's Allegation that the Viacom Directors Breached Their Fiduciary Duties in Structuring the Divestiture Fails to State a Claim.

Pfeffer alleges that the Special Dividend and the Exchange Offer should be subject to entire fairness scrutiny because NAI, as the controlling stockholder of Viacom, elevated its financial interests over those of the minority holders and stood on both sides of the transactions.

---

**12.** *See Pfeffer v. Redstone*, 2008 WL 308450 (Del.Ch.).

**13.** Count I Breach of Fiduciary Duty of Disclosure against the Viacom Director Defendants; Count II Breach of Fiduciary Duties of Loyalty and Good Faith against the Viacom Director Defendants; Count III Breach of Fiduciary Duty against the Viacom Director Defendants; Count IV Breach of Fiduciary Duties of Loyalty and Good Faith against NAI. We note that though Pfeffer states in her Opening Brief that she appeals these claims against both NAI and the Viacom Di-

rectors, we, as did the Vice Chancellor, recognize that the amended complaint sues the Viacom Directors in the first three counts and NAI in the fourth count.

**14.** *Feldman v. Cutaia*, 951 A.2d 727, 730 (Del. 2008).

**15.** *Id.* at 731.

**16.** *Id.; Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del.1996).

The Vice Chancellor recognized that "Delaware law does not impose a duty of entire fairness on controlling stockholders making a non-coercive tender or exchange offer to acquire shares directly from the minority holders." [17] Nor does Delaware law require entire fairness scrutiny where a corporation engaged in a voluntary, noncoercive offer.[18] But, the Viacom Directors did have a duty to structure the terms of the Exchange Offer noncoercively and to disclose all material facts relating to it.[19]

The Vice Chancellor concluded that the Viacom Directors had structured the Exchange Offer noncoercively and disclosed all material facts. We agree. Although Viacom made the Exchange Offer to its minority stockholders, the Viacom board did not recommend in the Prospectus that those stockholders exchange their shares. The Exchange Offer was purely voluntary, and the Prospectus clearly disclosed that NAI would not participate in the Exchange Offer. The Vice Chancellor properly found that the complaint did not suggest that the Viacom directors who approved the Exchange Offer structured it in a way that favored their interests over the stockholders'. Therefore, Pfeffer's complaint would state a claim for relief only if it adequately pleaded disclosure violations. That brings us to the disclosure claims.

## II. *The Claim that the Viacom Directors Breached Their Fiduciary Duty of Disclosure is Legally Insufficient.*

As the Vice Chancellor correctly stated, that "[t]he duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." [20] "Corporate fiduciaries can breach their duty of disclosure under Delaware law ... by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading." [21] "Material facts are those facts for which 'there is a substantial likelihood that a reasonable person would consider [them] important in deciding how to vote.' " [22]

Pfeffer challenges the Vice Chancellor's dismissal of her complaint, which (she claims) states duty of disclosure violations in four respects. First, Pfeffer claims that she adequately pleaded that the Prospectus' disclosures about Blockbuster's operational cash flow were material. Second, Pfeffer asserts that she adequately pleaded that the Viacom board knew or should have known of Blockbuster's operational cash flow deficiencies and that the divestiture would leave Blockbuster unable to meet its operational goals. Third, Pfeffer contends that the Vice Chancellor erred by

17. *Pfeffer*, 2008 WL 308450, at *7 (quoting *In re Aquila Inc.*, 805 A.2d 184, 190 (Del.Ch. 2002)). *See also Solomon*, 672 A.2d at 39–40, stating:

> In the case of totally voluntary tender offers ... courts do not impose any right of the shareholders to receive a particular price.
> ... [I]n the absence of coercion or disclosure violations, the adequacy of the price in a voluntary tender offer cannot be an issue. *Id.*

18. *Id.* (citing *Frank v. Arnelle*, 1998 WL 668649, at *4 (Del.Ch.), *aff'd*, 1999 WL 89284 (Del.) *(Frank I)* ("neither Delaware law nor

federal law requires the issuer in a Dutch auction to offer its stockholders the opportunity to tender at a *fair price* ")).

19. *Solomon*, 672 A.2d at 39 (internal citation omitted).

20. *Pfeffer*, 2008 WL 308450, at *8 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del.2001)).

21. *Id.* (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del.Ch.1999)).

22. *Id.*

finding that the Viacom board's methodology for determining the exchange ratio was not material. Fourth, Pfeffer argues that the Vice Chancellor erred by finding the composition of the Viacom special committee who structured the divestiture to be immaterial.

The Viacom Directors respond that, even if there were misstatements or omissions, they were not material. The Vice Chancellor agreed. We review those findings in the sections that follow.

### A. *Pfeffer Failed to Plead that the Alleged Misstatements Regarding Blockbuster's Operational Cash Flow were Material.*

Pfeffer contends that Blockbuster's accounting reclassification, which occurred approximately one and one half years after the Prospectus was distributed, demonstrates that the Prospectus was misleading and contained material misstatements. The complaint alleged that: (1) the Prospectus "misrepresented Blockbuster's cash flow—so vital to the funding of its growth plans—by more than 58%;" and that (2) the Prospectus represented that Blockbuster's ability to maintain sufficient operating cash flow was critical to funding Blockbuster's new plan. Thus, Pfeffer concludes, there being no dispute that the disclosure regarding the operational cash flow constituted misstatements, the only issue was whether those misstatements were material.[23]

The Viacom Directors respond that: "Plaintiff conceded at oral argument [in the Court of Chancery] that she has no basis by which to allege that the reclassification of Blockbuster's cash flows affected Blockbuster's earnings, total cash flow, net income, or any other accounting measure." The Viacom Directors further argue that the complaint did not allege that anyone had relied on the cash flow analysis that led to the reclassification.

■■■■ "To state a claim for breach of the fiduciary duty of disclosure on the basis of a false statement or representation, a plaintiff must identify (1) a material statement or representation in a communication contemplating stockholder action (2) that is false."[24] The "issue of materiality of an alleged misstatement or omission in a prospectus is a mixed question of law and fact, but predominantly a question of fact."[25] "Nevertheless, conclusory allegations need not be treated as true, nor should inferences be drawn unless they truly are reasonable."[26]

■■■■ The Vice Chancellor determined that "the plaintiff fail[ed] to advance well pleaded allegations of fact that a reasonable person, in deciding how to vote, would consider important the reclassification of operational and investing cash flows in this case."[27] Although the Vice Chancellor found that some of the cash flow numbers in the Prospectus were later restated, that

---

23. The Viacom Directors refer to the reclassification as an alleged misstatement.

24. *O'Reilly*, 745 A.2d at 920; *Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 141 (Del.1997) ("A claim based on disclosure violations must provide some basis for a court to infer that the alleged violations were material.").

25. *Branson v. Exide Electronics Corp.*, 1994 WL 164084, at *2 (Del.).

26. *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008) (citing *White v. Panic*, 783 A.2d 543, 549 (Del.2001)). *See Grobow v. Perot*, 539 A.2d 180, 187 n. 6 (Del.1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del.2000) ("a trial court need not blindly accept as true all allegations, not must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.").

27. *Pfeffer*, 2008 WL 308450, at *8.

Pfeffer did not sufficiently demonstrate why that fact was material. The Vice Chancellor recognized that the cash flow restatement merely reclassified certain cash flows, but the reclassification did not affect the total cash flows, net income, or any other reported accounting figure. Nor, (the Vice Chancellor further noted) did the complaint plead that disclosure of the restatement affected the Blockbuster stock price. Moreover, Blockbuster's certified financial statements explained its accounting methods. The Vice Chancellor concluded that the complaint failed to allege how the restatement of operating cash flows rose to the level of a material misstatement so as to constitute a disclosure violation.[28] Therefore, Pfeffer did not allege any factual basis for her claim that the Viacom Directors knew or should have known that Blockbuster's operating cash flow statements were materially misleading. We conclude that the Vice Chancellor's reasoning is correct.

### B. Pfeffer Failed to Sufficiently Plead that Blockbuster's Cash Flow Analysis was Reasonably Available to the Viacom Directors.

Relying upon a cash flow analysis proposed by a Blockbuster treasury employee seven months before the Special Dividend and the Exchange Offer occurred, Pfeffer claims that the Viacom Directors knew or should have known that Blockbuster faced operational cash flow problems before the Exchange Offer. Pfeffer contends that Redstone knew or should have known about the cash flow analysis because John Antioco, Blockbuster's Chairman and CEO, would have told him. Pfeffer asserts that her complaint adequately pleads that Viacom should have disclosed the cash flow analysis. The Viacom Directors maintain, however, that they did not know of the cash flow analysis and, moreover, that the Prospectus adequately disclosed the potential cash flow problems Blockbuster might experience as a result of the Special Dividend and the Exchange Offer. They assert that Pfeffer's claim rests on no more than supposition and surmise.

For the Viacom Directors to have either misstated or failed to disclose the cash flow analysis in the Prospectus, those directors must have had reasonable access to that Blockbuster information. "To state a claim for breach by omission of any duty to disclose, a plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials."[29] "[O]mitted information is *material* if a reasonable stockholder would consider it important in deciding whether to tender his shares or would find that the information has altered the 'total mix' of information available."[30] The Viacom Directors must fully and fairly disclose all material information within its control when seeking shareholder action.[31] They are not excused from disclosing material facts simply because the Prospectus disclosed risk fac-

28. *See O'Reilly,* 745 A.2d at 920 ("To state a claim for breach of the fiduciary duty of disclosure on the basis of a false statement or representation, a plaintiff must identify (1) a material statement or representation in a communication contemplating stockholder action (2) that is false.").

29. *Id.* at 926 (citing *Wolf v. Assaf,* 1998 WL 326662, at *4–5 (Del.Ch.)).

30. *Frank v. Arnelle,* 1998 WL 668649, at *3 (Del.Ch.), *af'd,* 1999 WL 89284 (Del.) *(Frank I)* (emphasis in original); *see Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) adopting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

31. *Stroud v. Grace,* 606 A.2d 75, 84 (Del. 1992).

tors attending the tender offer.[32] If the Viacom Directors did not know or have reason to know the allegedly missing facts, however, then logically the directors could not disclose them.

■ The Vice Chancellor determined that Pfeffer's pleading was "based entirely on a daisy chain of surmise and illogic."[33] Pfeffer's allegation that Redstone would know about Blockbuster's cash flows because Antioco knew this information and would have told Redstone did not persuade him. Pfeffer's allegation that Redstone would have then told the other Viacom Directors similarly failed to impress the Vice Chancellor. Important in this regard is that Blockbuster's Senior Vice President of Investor Relations and Treasurer told her subordinates not to focus on the cash flow analysis. The Vice Chancellor regarded that fact as a reasonable basis to infer that even the Blockbuster Directors would not have known about the cash flow analysis. Nothing alleged in the complaint justified any contrary inference.

■ The Vice Chancellor did consider fact patterns where bare allegations of knowledge might suffice; for example, if a document was "of the kind routinely disclosed to boards of directors."[34] Here, however, the cash flow analysis was not the kind of document routinely disclosed to a parent corporation's board of directors. The Vice Chancellor so concluded. Pfeffer complains that the Vice Chancellor's factual conclusions, including this one, were improper Although there is "no reason to

depart from the general pleading rules when alleging duty of disclosure violations," "it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory."[35] When pleading a breach of fiduciary duty based on the Viacom Directors' knowledge, Pfeffer must, at a minimum, offer "well-pleaded facts from which it can be reasonably inferred that this "something" was knowable and that the defendant was in a position to know it."[36]

Other than conclusorily asserting that the Viacom Directors would (or must) have been told this information, Pfeffer did not sufficiently plead any other facts to support that inference. The assertion that the Viacom Directors knew of the cash flow analysis because Antioco would have told Redstone could not be more conclusory. Because Pfeffer failed to allege that the cash flow analysis performed by a midlevel treasury manager of a subsidiary corporation would be routinely available to the Viacom Directors, the Vice Chancellor correctly dismissed this claim.

### C. *How the Exchange Ratio was Determined is Not Material.*

The Vice Chancellor also determined that Viacom's method for deriving the exchange ratio was not material because the Viacom Directors did not specifically represent that the price offered was fair. Pfeffer claims that was error. Pfeffer stresses that Viacom's voluntary disclosure

32. *See Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del.1977) (the duty of disclosure is not fulfilled by technically correct generalized statements).

33. *Pfeffer*, 2008 WL 308450, at *10.

34. *Id.*

35. *Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 140 (Del.1997).

36. *IOTEX Communications, Inc. v. Defries*, 1998 WL 914265, at *4 (Del.Ch.).

was a misleading partial disclosure, because the Viacom shareholders deserved to know how their directors calculated the exchange ratio. The Viacom Directors maintain that they were not required to disclose the exact exchange ratio methodology because they neither declared that the Exchange Offer was fair nor recommended that the Viacom minority stockholders participate.

 To state a claim based on partial disclosure, "a plaintiff must plead facts identifying a (1) perhaps voluntary, but (2) materially incomplete (3) statement (4) made in conjunction with solicitation of stockholder action that (5) requires supplementation or clarification through (6) corrective disclosure of perhaps otherwise material, but reasonably available information."[37] Information material to a stockholder's decision to hold or dispose shares must be disclosed.[38] In a non-coercive voluntary self tender, however:

> Delaware courts generally do not require disclosure of pricing methodology in connection with non-coercive self-tender offers. Such disclosure would be

necessary where the board has a duty to offer a *fair* price ... or the board has made a partial disclosure that *implies* that the offered price is fair, thereby requiring additional disclosures to ensure a balanced presentation.[39]

 The Prospectus clearly stated that the boards of both Viacom and Blockbuster were making no recommendation regarding whether Viacom stockholders should participate in the Exchange Offer.[40] It further disclosed that the Exchange Offer was voluntary and noncoercive.[41] Indeed, the Prospectus disclosed that "Viacom cannot predict the prices at which shares of Viacom ... stock or Blockbuster ... stock will be trading at the expiration date of the exchange offer, and therefore, cannot predict whether stockholders who participate in this exchange will receive a premium for their shares." Although the Prospectus stated that a primary reason for the price was to induce the stockholder to tender, it did not imply that the Exchange Offer was fair or suggest that the price represented the stock's intrinsic value.[42] For that reason, the Viacom stockholders could not reasonably rely on either

---

**37.** *O'Reilly v. Transworld Healthcare, Inc.,* 745 A.2d 902, 927 (Del.Ch.1999) (internal citation omitted).

**38.** *Stroud v. Grace,* 606 A.2d 75, 84–88 (Del. 1992); *Frank v. Arnelle,* 1999 WL 89284, at *2 (Del) (*Frank II* ).

**39.** *Frank v. Arnelle,* 1998 WL 668649, at *5 (Del.Ch.), af'd, 1999 WL 89284 (Del.) (*Frank I* ) (emphasis in original); *see Frank II,* 1999 WL 89284, at *2 ((a) because the tender offer was noncoercive the directors were not required to pay an intrinsically fair price; (b) because the tender offer did not make a recommendation there was no implication that the price was fair; and (c) because the directors did not imply that the price was fair the directors had no duty to disclose Merrill–Lynch's opinion of the stock's intrinsic value);

*see also In re Aquila Inc.,* 805 A.2d 184, 190 (Del.Ch.2002) ("Delaware law does not impose a duty of entire fairness on controlling stockholders making a non-coercive tender or exchange offer to acquire shares directly from the minority holders.").

**40.** *See Frank II,* 1999 WL 89284, at *2 (because the tender offer did not make a recommendation there was no implication that the price was fair).

**41.** *See id.* (because the tender offer was noncoercive the directors were not required to pay an intrinsically fair price).

**42.** *See id.* (because the directors did not imply that the price was fair the directors had no duty to disclose Merrill–Lynch's opinion of the stock's intrinsic value).

the exchange ratio or the price to be fair when deciding whether to tender their shares. The Vice Chancellor correctly determined that the methodology used to determine the exchange ratio was not material. We therefore affirm the Vice Chancellor's dismissal of this claim.

### D. *The Composition of the Viacom Special Committee was Not Material.*

Pfeffer next claims that Viacom's disclosure that a special committee existed in the Prospectus, without also disclosing the committee directors' names, breached the Viacom Directors' disclosure duty.[43]

In *Frank v. Arnelle,* the Court of Chancery held that: "the fact that a special committee, as opposed to the full Board, set the price range and other terms [is not] material." [44] The Offer to Purchase in *Frank* did not disclose the involvement of a special committee. Here, the Viacom Prospectus explicitly referenced the special committee. That caused the Vice Chancellor to frame the issue in terms of whether that disclosure was materially incomplete.

■■■■■ It is well settled that "[W]hen fiduciaries undertake to describe events,

they must do so in a balanced and accurate fashion, which does not create a materially misleading impression." [45] "[T]he disclosure of even a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders." [46]

■■■■ Here, the Vice Chancellor determined, a single reference to the Viacom special committee did not require further elaboration because the Prospectus did not suggest that the committee had decided anything more significant than what the full Board could have decided. The omission was not materially misleading because "[t]here is no indication that the committee was independent of management or NAI, nor does the language in the Prospectus induce stockholders to rely on the special committee's decision to validate the transaction." [47] The Prospectus fully disclosed that NAI was the controlling stockholder of Viacom and that Redstone was the controlling stockholder of NAI as well as Viacom's chairman and CEO.

We agree that the composition of the Viacom special committee was not material and that the Prospectus did not omit material information about the committee. We

---

**43.** The Prospectus stated:

> On June 17, 2004 a committee of Viacom's board of directors delegated with authority to approve the final form of the divestiture of Blockbuster from Viacom approved the divestiture by means of the split-off contemplated by this Prospectus–Offer to Exchange. The committee also approved Viacom's entry into the various separation agreements described on the section entitled "Agreements Between Viacom and Blockbuster and Other Related Party transactions."

**44.** *Frank v. Arnelle,* 1998 WL 668649, at *5.

**45.** *Clements v. Rogers,* 790 A.2d 1222, 1240 (Del.Ch.2001) (citing *Zirn v. VLI Corp.,* 681 A.2d 1050, 1056 (Del.1996)).

**46.** *Id.* (quoting *Zirn,* 681 A.2d at 1056); *see Arnold v. Society for Savings Bancorp,* 650 A.2d 1270, 1280 (Del.1994).

**47.** *Pfeffer,* 2008 WL 308450, at *13 The Vice Chancellor continued to opine that "this passing reference to the committee did not materially mislead stockholders because nothing in the Prospectus suggests that its decision carried any greater significance than that of the full board of directors." *Id.*

therefore hold that the Vice Chancellor correctly dismissed this claim.

### III. Pfeffer's Claim that the Viacom Directors and NAI Breached their Duty of Loyalty is Legally Deficient.

#### A. Pfeffer Fails to Allege that the Viacom Directors Breached Their Fiduciary Duty of Loyalty.

Pfeffer claims that the Viacom Directors designed the transaction to benefit Redstone and NAI. But, she fails to allege that the directors stood on both sides of the Exchange Offer or that they received a unique financial benefit to the exclusion of the shareholders. Pfeffer's complaint alleges conclusorily that "[e]ach of the Viacom Director Defendants breached their fiduciary duties of loyalty and care in approving and/or acquiescing in the Exchange Offer on terms that were unfair to Viacom's minority shareholders and unfairly benefited Viacom's controlling shareholder, NAI, and Redstone."

 "[W]here there is reason to believe that the board lacked good faith in approving a disclosure, the violation implicates the duty of loyalty." [48] Conclusory allegations that NAI unfairly benefited from the Exchange Offer, however, are insufficient to state a claim that the Viacom Directors acted in bad faith, thereby breaching their duty of loyalty. [49]

The Vice Chancellor correctly determined that 8 Del. C. § 144 does not apply to the Exchange Offer, because Section 144 refers to interested transactions, which this Exchange Offer was not. A transaction is interested where directors appear on both sides of a transaction or expect to derive a financial benefit from it that does not "devolve[ ] upon the corporation or all stockholders generally." [50] This personal benefit must be so significant that it is "improbable that the director could perform her fiduciary duties ... without being influenced by her overriding personal interest." [51]

Pfeffer complains that Redstone, through his company NAI, received an overwhelming majority of the Special Dividend. That may be true, but it does not establish a disqualifying self interest since NAI held a majority of Viacom's stock. What *is* significant is that Director Redstone and NAI received nothing unique that was otherwise unavailable to the other stockholders. Pfeffer also complains that as a result of the Exchange Offer, Redstone and NAI increased their majority control of Viacom. But, that without more, does not state a legally sufficient claim that Redstone and NAI acted in bad faith. Finally, Pfeffer alleges that Viacom Directors failed to disclose facts about Blockbuster's perilous financials. As we have already held, the complaint fails to allege facts creating a reasonable inference that the Viacom Directors had access to that financial information.

We conclude, for these reasons, that the Vice Chancellor properly dismissed the breach of duty of loyalty claim against the Viacom Directors.

---

**48.** *In re Tyson Foods, Inc.*, 919 A.2d 563, 597–98 (Del.Ch.2007).

**49.** *See Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 140 (Del.1997) ("it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory").

**50.** *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del.2000).

**51.** *Hokanson v. Petty*, 2008 WL 5169633, at *7 (Del.Ch.) (internal citation omitted).

## B. *Pfeffer Fails to State a Claim that NAI Breached Its Fiduciary Duties as a Controlling Shareholder.*

■ Lastly, Pfeffer claims that "NAI breached its fiduciary duties owed to the Viacom minority ... by causing the Viacom Director Defendants to approve and recommend [sic] the Exchange Offer to Viacom's minority shareholders." NAI, however, did not construct or direct the Exchange Offer or the Special Dividend, and Pfeffer fails to allege any well pleaded facts showing the contrary. She merely argues that NAI failed to disclose that the Prospectus contained misleading financial statements. Had Pfeffer sufficiently pleaded that NAI engaged in crafting the transactions and then directed the Viacom Directors' conduct, she may have stated a claim,[52] but reciting alleged Prospectus disclosure omissions falls far short of implicating NAI for breach of its fiduciary duty as a controlling stockholder. For these reasons, the Vice Chancellor correctly dismissed the breach of loyalty claim against NAI.

### CONCLUSION

For the foregoing reasons, we affirm the Court of Chancery's judgment.

---

**52.** The Vice Chancellor properly relied on *Cinerama, Inc. v. Technicolor, Inc.,* 1991 WL 111134, at *19 (Del.Ch.), *aff'd in part, rev'd on other grounds sub nom,* 634 A.2d 345 (Del. 1993) ("when a shareholder, who achieves power through the ownership of stock, exercises that power by directing the actions of the corporation, he assumes the duties of care and loyalty of a director of a corporation. When, on the other hand, a majority shareholder takes no such action, generally no special duty will be imposed.").