# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MERRIT QUARUM,                          )
                                        )
              Plaintiff,                )
                                        )
       v.                               )   C.A. No.: N19C-03-087 AML CCLD
                                        )
MITCHELL INTERNATIONAL,                 )
INC.,                                   )
                                        )
              Defendant.                )

Submitted: October 16, 2019
Decided: January 21, 2020

**Upon Defendant's Motion to Dismiss Count I of Plaintiff's
Second Amended Complaint: Granted in Part, Denied in Part**

## MEMORANDUM OPINION

David P. Primack, Esquire, David W. Giattino, Esquire, of McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, Wilmington, Delaware, and Noah Jarrett, Esquire, of SCHWABE, WILLIAMSON & WYATT PC, Portland, Oregon, *Attorneys for Plaintiff.*

John P. DiTomo, Esquire, Alexandra Cumings, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, and Michael A. Duffy, Esquire, Michael C. McCutcheon, Esquire, of BAKER & McKENZIE LLP, Chicago, Illinois, *Attorneys for Defendant.*

**LeGrow, J.**

In October 2016, buyer purchased sellers' shares of QMedtrix Systems, Inc., and the parties executed a stock purchase agreement governing the sale. To complete the transaction, the parties also entered into an earnout agreement and an employment agreement calling for one of the sellers' continued employment with the company. Two years later, sellers' representative initiated this action against buyer alleging non-compliance with the earnout agreement along with various employment-related claims. Buyer answered and asserted several counterclaims against sellers for breach of contract, breach of trade secret acts, and conversion.

Buyer also moved to dismiss Count I of sellers' complaint for failure to state a claim. That count alleges various breaches of the earnout agreement, specifically the section requiring buyer to undertake certain efforts intended to improve sales of QMedtrix's products. The primary questions before the Court are (1) whether sellers adequately pleaded that buyer's failure actively to promote the product breached a clause in the earnout agreement that prohibited buyer from taking actions that materially would reduce the earnout; and (2) whether sellers elected a remedy by sending notice that buyer's failure to use commercially reasonable efforts extended the term of the contract. For the following reasons, I dismiss the majority of sellers' claim relating to the material reduction clause. As to the remaining allegations in Count I, I conclude sellers have not elected a remedy that precludes their damages

claim here, and the balance of Count I therefore survives under the minimal pleading standard applicable to a motion to dismiss.

## FACTS AND PROCEDURAL BACKGROUND

The following facts are drawn from the complaint. On October 31, 2016 (the "Closing Date"), Dr. Merrit Quarum, along with Ann Bunnenberg, Steve Stratos, Ira M. Weintraud, and Linda C. Hall (collectively, the "Sellers"),[1] entered into a Stock Purchase Agreement ("SPA") with Mitchell International, Inc. ("Mitchell"). Pursuant to the SPA, Mitchell acquired all Sellers' shares of QMedtrix Systems, Inc. ("QMedtrix"). QMedtrix developed streamlined review and approval processes for physicians' reimbursement claims with insurance companies related to workers compensation and automobile insurance claims (the "Solutions").[2]

### The Earnout Agreement

As part of the transaction, Sellers and Mitchell also entered into an Earnout Agreement. The Earnout Agreement allowed Sellers to earn additional compensation based on sales of the Solutions to Mitchell's customers during the first two years after the Closing Date. Sellers believed the earnout amount would be

---

[1] "Under the terms of the SPA, Dr. Quarum was appointed as the Sellers' Representative and empowered with the right to act as agent and attorney-in-fact for the Sellers with full power and authority to take all action necessary or appropriate in any claims that might arise between Mitchell and Sellers relating to the SPA and/or the Earnout Agreement." Pl.'s Second Am. Verified Compl. (hereinafter "Second Am. Compl.") ¶ 5.

[2] "'Solutions' means . . . (a) the Qrates Solution and the BillChek Solution . . . , and (b) the FairPay Solution . . . ." Earnout Agreement § 1(a).

2

significant based on the Solutions' past success and Mitchell's obligations to promote the Solutions and utilize Dr. Quarum's knowledge base.

Under the Earnout Agreement, Mitchell was obligated to provide Sellers a net margin certificate setting the net margin amount due each month, which was to be calculated based on the Solutions' revenue. Additionally, Mitchell was obligated to pay, within 90 days following the last day of "Year 2,"[3] the final earnout amount due based upon the Solutions and FairPay[4] revenue.

In order to make sure Mitchell marketed the Solutions to its customers, Section 6 of the Earnout Agreement contained specific covenants and obligations to which Mitchell agreed. Section 6 states relevantly:

> (a) The Sellers acknowledge and agree that [Mitchell], as the ultimate owner of [QMedtrix] from Closing, has the power to direct the management, strategy and decisions of [QMedtrix]. Notwithstanding the foregoing, [Mitchell] agrees it will, and it will cause [QMedtrix] to and its affiliates to, act in good faith and in a commercially reasonable manner to avoid taking actions that would reasonably be expected to materially reduce the Contingent Payment Amounts or otherwise materially impede or delay the calculation of Revenue and Net Margin in accordance with Appendix B[.][5]
>
> (b) [Mitchell] will act in good faith and use commercially reasonable efforts to present and promote the Solutions to customers that could reasonably be expected to utilize the Solutions.[6]

---

[3] *Id.* (defining "Year 2").
[4] *Id.* (defining "FairPay Solution" as "Buyer's specialty bill review solution marketed and sold under the FairPay brand").
[5] *Id.* § 6(a).
[6] *Id.* § 6(b).

(c) [Mitchell] will[,] . . . (ii) within six (6) months after the Closing Date, (A) upgrade the existing bridge between [Mitchell's] SmartAdvisor system and build a new bridge to the DecisionPoint system, that will allow [QMedtrix] to provide the Solutions to [Mitchell's] customers that have agreed to use the Solutions and to calculate the Revenue and Net Margin generated from such customers in accordance with Appendix B[.][7]

## The Employment Agreement

In connection with the SPA and the Earnout Agreement, Dr. Quarum, in his individual capacity, also agreed to become a Mitchell employee. Dr. Quarum and Mitchell agreed to employment terms and conditions in an Executive Employment Agreement, which stated Dr. Quarum could not be terminated before October 31, 2018 other than "for cause," as the Employment Agreement defined that term.[8]

## Post-Closing Date

Dr. Quarum alleges Mitchell failed to act in good faith and use commercially reasonable efforts after the Closing Date "to present and promote the Solutions to its customers, and Mitchell [] wholly failed to perform the specific covenants required under the SPA."[9] Dr. Quarum contends Mitchell took steps to sideline him by not allowing him to participate in marketing the Solutions, and Mitchell "depressed the amount of the Earnout by sidelining Dr. Quarum and diverting resources, including

---

[7] *Id.* § 6(c)(ii).
[8] *See* Employment Agreement § III(A) ("[QMedtrix] will not terminate Executive's employment other than For Cause . . . before the two (2) year anniversary of the Closing."); *id.* § IV(A) (defining "For Cause").
[9] Second Am. Compl. ¶ 20.

4

customers, from the Solutions."[10] Additionally, Dr. Quarum contends Mitchell "failed to upgrade its SmartAdvisor system," did not build a new bridge to the DecisionPoint system as required by the Earnout Agreement, and instead decided to build a bridge to a different system because the bridge to SmartAdvisor purportedly would take too long.[11]

**Procedural History**

Mitchell terminated Dr. Quarum on January 8, 2018. Eleven days later, Dr. Quarum filed a lawsuit in the Delaware Court of Chancery seeking injunctive relief and damages based on Mitchell's alleged failure to comply with the Earnout Agreement. While Mitchell's motion to dismiss that action was pending, Dr. Quarum filed suit in Oregon against Mitchell for damages based on the same series of underlying events. The Oregon case was removed to federal court and remains pending in the U.S. District Court for the District of Delaware. The Court of Chancery granted Mitchell's motion to dismiss for lack of subject matter jurisdiction on January 10, 2019, and Dr. Quarum elected to transfer that action to this Court and amend his complaint. The employment claims in federal court were consolidated with this action, and Dr. Quarum filed the Second Amended Complaint on May 20, 2019. In the Second Amended Complaint, Dr. Quarum seeks relief individually for

---

[10] Pl.'s Answering Br. Opposing Def.'s Mot. to Dismiss Count I of Pl.'s Second Am. Verified Compl. (hereinafter "Pl.'s Answering Br.") 4.

[11] Second Am. Compl. ¶ 41.

5

various employment claims and on behalf of the Sellers in his capacity as the Sellers' representative. On June 19, 2019, Mitchell filed a motion to dismiss Count I of the Second Amended Complaint for failure to state a claim.

**The Parties' Contentions**

In its motion to dismiss, Mitchell argues Count I of the Second Amended Complaint fails to state a claim because Dr. Quarum did not plead one or more of the required elements of a breach of contract claim. Mitchell first argues Dr. Quarum has not pleaded that Mitchell took any affirmative action that would constitute a breach of Section 6(a) of the Earnout Agreement, and Dr. Quarum's employment or continued employment never was a requirement of the Earnout Agreement. Mitchell also contends Dr. Quarum cannot plead damages resulting from Mitchell's alleged breach of Section 6(b) because Dr. Quarum already had attempted to elect the remedy of extending the relevant contract term. Finally, Mitchell argues Dr. Quarum has not pleaded any damages arising from Mitchell's alleged breach of Section 6(c) regarding the virtual bridge between Mitchell and its customers.

In response, Dr. Quarum contends Count I contains well-pleaded allegations that support a reasonable inference that Mitchell breached obligations (1) under Section 6(a), because the "Second Clause" of Section 6(a) is an affirmative covenant and Mitchell failed to act in good faith and use commercially reasonable efforts to promote the Solutions; (2) under Section 6(b), because the Election of Remedies

6

doctrine does not apply to the facts of this case; and (3) under Section 6(c), because Mitchell caused Dr. Quarum to incur damages arising from Mitchell's failure to build the virtual bridge between Mitchell and its customers.

## ANALYSIS

On a motion to dismiss, the Court must determine whether the plaintiff "may recover under any reasonably conceivable set of circumstances susceptible of proof[.]"[12] A court may grant the motion if "it appears to a reasonable certainty that under no state of facts which could be proved to support the claim asserted would [the] plaintiff be entitled to relief."[13] When applying this standard, the Court will accept as true all non-conclusory, well-pleaded allegations[14] and must draw all reasonable factual inferences in favor of the non-moving party.[15]

**A.     Dr. Quarum alleges a reasonably conceivable claim under Section 6(a) of the Earnout Agreement, but only as to actions Mitchell affirmatively took that allegedly reduced the earnout amount or impeded its calculation.**

The parties' dispute regarding the adequacy of Dr. Quarum's claims under Section 6(a) essentially is a dispute as to whether that Section creates an affirmative or negative covenant. As the Court of Chancery explained in *Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*, there generally is an acknowledged

---

[12] *Holmes v. D'Elia*, 2015 WL 8480150, at *2 (Del. Dec. 8, 2015) (quoting *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978)).

[13] *Fish Eng'g Corp. v. Hutchinson*, 162 A.2d 722, 724 (Del. 1960).

[14] *Pfeffer v. Redstone*, 965 A.2d 676, 683 (Del. 2009).

[15] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) (citing *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998) (internal citations omitted)).

7

distinction between affirmative covenants and negative covenants.[16] The former requires the bound party to take action, while the latter forbids action.[17] Because liability from a negative covenant only arises from action,[18] allegations that the bound party failed to do certain things cannot state a breach of a negative covenant.

Section 6(a), in relevant part, states:

> The Sellers acknowledge and agree that [Mitchell], as the ultimate owner of [QMedtrix] from Closing, has the power to direct the management, strategy and decisions of [QMedtrix]. Notwithstanding the foregoing, *[Mitchell] agrees it will*, and it will cause [QMedtrix] and its affiliates to, *act in good faith and in a commercially reasonable manner to avoid taking actions that would reasonably be expected to materially reduce the Contingent Payment Amounts or otherwise materially impede or delay the calculation* of Revenue and Net Margin in accordance with Appendix B[.][19]

Dr. Quarum argues this language creates an affirmative covenant that requires Mitchell actively to avoid taking any action or failing to take any action that materially reduces the earnout amount or delays its calculation. That is, Dr. Quarum contends that Section 6(a) applies both to actions and inactions, and before making any decision regarding how to run the business, Mitchell was required to consider the probable effect of that decision on the earnout amount and avoid pursuing that

---

[16] *All. Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 766 (Del. Ch. 2009).
[17] *Id.* ("This tracks a generally acknowledged distinction in merger agreements between affirmative and negative covenants: affirmative covenants require that a bound party take action while negative covenants forbid action."); Black's Law Dictionary (8th ed. 2004) (defining an affirmative covenant as "[a] covenant that obligates a party to do some act" and a negative covenant as "[a] covenant that requires a party to refrain from doing something").
[18] *See All. Data Sys. Corp.*, 963 A.2d at 766.
[19] Earnout Agreement § 6(a) (emphasis added).

course if it negatively would affect the earnout amount. According to Dr. Quarum, the use of the word "avoid" distinguishes Section 6(a) from cases holding that an agreement not to take an action is a negative covenant.[20] Thus, according to Dr. Quarum, if Mitchell decided not to utilize Dr. Quarum for certain responsibilities, but that decision likely materially would reduce the earnout amount, Section 6(a) required Mitchell to "avoid" that inaction and instead utilize Dr. Quarum. This, Dr. Quarum alleges, Mitchell did not do.

Mitchell disagrees with the premise underlying that interpretation, arguing instead that Section 6(a) is a negative covenant because by its "plain language, [the] allegations regarding the *absence* of action, even if accepted as true for purposes of this motion, cannot constitute breach of that provision."[21] Mitchell contends reading Section 6(a) in the manner Dr. Quarum urges would require Mitchell to run the company entirely based on how Mitchell's business decisions might affect Sellers' earnout. Mitchell argues Section 6(a) is a negative covenant that merely prohibits Mitchell from taking affirmative actions reasonably expected to reduce the earnout.

When a contract is clear and unambiguous, the Court accords its terms and provisions their plain meaning.[22] Section 6(a), by its plain meaning, is a negative

---

[20] *See All. Data Sys. Corp.*, 963 A.2d at 766 (citing *Energy Partners, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *13 (Del. Ch. Oct. 11, 2006)).
[21] Opening Br. in Supp. of Def.'s Mot. to Dismiss Count I of Pl.'s Second Am. Verified Compl. (hereinafter "Def.'s Mot. to Dismiss") 14.
[22] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010); *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("Clear and unambiguous

covenant. Dr. Quarum's proffered interpretation, which he struggled to articulate at oral argument, is convoluted and contrary to the plain language. There is no material distinction between avoiding taking an action and not taking an action, and Dr. Quarum's effort to convert the negative covenant into an affirmative covenant on the basis of the word "avoid" falls flat.

The plain language of Section 6(a), read in its entirety, confirms that Mitchell retained the sole authority to direct QMedtrix's strategy and business decisions. The caveat, however, was that Mitchell agreed to act in good faith and in a commercially reasonable manner to avoid taking actions that materially would reduce the earnout amount. "Avoid," like similar negative verbs, requires a person to refrain from taking action. Avoiding actions, however, is distinct from avoiding inaction,[23] even deliberate inaction. Avoiding actions, by definition, is a negative covenant that Mitchell only could breach by taking positive action. Other sections in the Earnout Agreement contain affirmative covenants, including Sections 6(b) and 6(c), and the parties could have included an affirmative covenant in Section 6(a) had they wanted to do so. Dr. Quarum's reading of the contract would swallow Section 6(a)'s first sentence and effectively place the power to manage the company in his own hands.

---

language . . . should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it.") (internal citations omitted).

[23] Nature abhors a vacuum; writers of coherent sentences abhor a double negative.

10

With that contractual interpretation in mind, most of Dr. Quarum's allegations in the Second Amended Complaint do not state a claim for breach of Section 6(a). The majority of Dr. Quarum's allegations focus on the lack of any action taken by Mitchell, or decisions and strategies Mitchell could have pursued but did not. For example, Dr. Quarum alleges Mitchell "never consulted with Dr. Quarum on how it could market and promote the Solutions to customers[;]" "never once asked Dr. Quarum to help in developing any materials that would be provided to Mitchell's customers detailing the potential benefits of the Solutions to their business[;]" "never invited or allowed [Dr. Quarum] to participate in any presentation to Mitchell's customers regarding the potential benefits of the Solutions to their business;" and "refused to provide Dr. Quarum access to financial information and contracts so that he could promote the Solutions to Mitchell's customer base in furtherance of the purposes of the SPA and Earnout Agreement[.]"[24]

Those allegations do not allege a breach of Section 6(a). Dr. Quarum's claims under Section 6(a) survive only to the extent he alleges Mitchell took affirmative actions that Mitchell reasonably could have expected would reduce the earnout amount or impede its calculations. The following allegations state a reasonably conceivable claim:

> Ms. Smith routinely cancelled regularly scheduled phone calls in order
> to prevent Dr. Quarum from promoting and selling Solutions. Upon

---

[24] Second Am. Compl. ¶ 20.

information and belief, Ms. Smith had a motivation to, along with Mitchell, sabotage efforts to market the Solutions to Mitchell's customers, as the Solutions had potential to render her positive obsolete[.][25]

Mitchell's failures included, but are not limited to, improperly applying minimum thresholds to bills . . . , applying baselines or thresholds to accounts not agreed upon by the parties to reduce revenue that would increase amounts payable to Sellers, and by directing potential QRates customers to PPOs, thus diverting revenue that would otherwise be payable to Sellers.[26]

This claim survives based on these allegations, but Count I otherwise is dismissed to the extent it is based on any failure to act under Section 6(a) of the Earnout Agreement.

## B. The Election of Remedies doctrine does not bar Dr. Quarum's claim under Section 6(b) of the Earnout Agreement.

Mitchell argues "Dr. Quarum cannot currently plead monetary damages for Mitchell's alleged breach of Section 6(b) . . . as a matter of law because Dr. Quarum has already attempted to elect the remedy of extension of 'Year 2' in his Disagreement Notice served on December 13, 2018."[27] Dr. Quarum alleges Mitchell failed to use commercially reasonable efforts to promote the Solutions as required under Section 6(b), but Mitchell contends Dr. Quarum indicated in his December 2018 letter that he was electing to extend Year 2 until Mitchell complied with its

---

[25] *Id.* ¶ 20(c). This is a fairly vague allegation. Discovery will reveal whether there were positive actions of "sabotage" that would fall within Section 6(a).
[26] *Id.* ¶ 29.
[27] Def.'s Mot. to Dismiss 16.

obligations under Section 6(b). Mitchell argues Dr. Quarum cannot both elect the contractual remedy to extend the time period for calculating the final payout *and* seek damages for the same alleged breach.[28]

The Election of Remedies doctrine is based on "any decisive act of a party, with knowledge of his rights and of the facts, indicating an intent to pursue one remedy rather than the other."[29] Although earlier cases discuss the doctrine as having procedural and substantive elements,[30] the doctrine's procedural application has been subsumed and replaced by the Delaware Rules of Civil Procedure, which allow a party to plead claims in the alternative.[31] The doctrine's substantive aspects remain applicable. Substantively, a plaintiff "elects" a remedy when (1) the plaintiff makes a decisive act, (2) that act evinces an intent to pursue one remedy rather than another, and (3) the remedies are inconsistent.[32] For example, in *Stoltz Realty Co. v. Raphael*, the plaintiff participated in binding arbitration, an award was not issued in their favor, and they did not appeal the decision.[33] The Delaware Supreme Court

---

[28] *Id.* at 17.

[29] *Stoltz Realty Co. v. Raphael*, 458 A.2d 21, 23 (Del. 1983) (citing 28 C.J.S. *Election of Remedies* § 11 (1941)).

[30] *See Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1371 (7th Cir. 1990) ("The common law doctrine of election of [] remedies . . . has two aspects, a procedural and a substantive.").

[31] Super. Ct. Civ. R. 8(e)(2); *see Olympia Hotels Corp.*, 908 F.2d at 1371 ("Common law pleading was superseded long ago, however – in the federal courts by the Federal Rules of Civil Procedure, which expressly abolish election of remedies.").

[32] *See Stoltz Realty Co.*, 458 A.2d at 23; *see also Olympia Hotels Corp.*, 908 F.2d at 1371 ("In its substantive aspect, however, the doctrine of election of remedies is not affected by the federal rules of procedure.").

[33] *Stoltz Realty Co.*, 458 A.2d at 22.

held the plaintiff made a decisive act by electing the remedy of arbitration in regard to the defendant, and thereafter was barred from proceeding with litigation on the same issue against that same defendant.[34]

Dr. Quarum argues the Election of Remedies doctrine does not apply here for three main reasons: (1) "Dr. Quarum has not made a decisive act . . . [because he] did not even choose to enlarge Year 2" since it enlarged automatically when Mitchell failed to "use commercially reasonable efforts to present and promote the Solutions to customers" as required; (2) "even if Dr. Quarum caused Year 2 to enlarge, enlarging Year 2 is not inconsistent with the remedy that Dr. Quarum is seeking here – damages;" and (3) "there is no risk of the [Sellers] getting a double recovery."[35]

The Election of Remedies doctrine does not bar Dr. Quarum's claim under Section 6(b). The December 2018 letter was not a "decisive act" under the case law defining that term, as a "decisive act" generally is defined as pursuing a remedy to final judgment or filing a claim.[36] Mitchell conceded at oral argument that it cannot

---

[34] *Id.* at 22-23.

[35] Pl.'s Answering Br. 22-24.

[36] *See, e.g., Stoltz Realty Co.*, 458 A.2d at 23 ("[T]he prosecution of one remedial right to judgment or decree, whether for or against the plaintiff, is a 'decisive act which constitutes a conclusive election, barring the subsequent prosecution of inconsistent remedial rights.'"); *Maravilla-Diego v. MBM Constr. II, LLC*, 2015 WL 4468625, at *5 (Del. Super. July 21, 2015) (defining decisive act as "prosecuting a claim to a final judgment or decree"); *O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 2992099, at *4 (Del. Super. July 25, 2011) (defining decisive act as "the prosecution of a claim to a final judgment or decree" or "[t]he commencement of an action[] seeking one of the inconsistent remedies"); *Scott v. City of Harrington*, 1986 WL 4494, at *2 (Del. Ch. Apr. 14, 1986) (defining decisive act as "the prosecution of a claim to a final judgment or decree" or "[t]he commencement of an action[] seeking one of the inconsistent remedies").

14

cite any case law expanding "decisive act" to facts remotely analogous to the letter on which Mitchell relies.

Additionally, the December 2018 letter does not evince an intent to pursue one remedy to the exclusion of others. At that time he sent the letter, Dr. Quarum was pursuing in Court of Chancery a claim for injunctive relief and damages based upon breach of contract. The Court of Chancery then concluded Dr. Quarum did not state a valid injunctive relief claim and left room for Dr. Quarum to transfer the damages case to this Court.[37]

It is unclear at this stage whether the two remedies are inconsistent, but that issue is academic since the other required elements of the doctrine are not met. The true basis of Mitchell's argument appears to be that any damages claim other than an extension of Year 2 will be speculative and therefore ultimately may not prevail. That was not, however, the basis for Mitchell's motion, and it is not a valid basis to dismiss the claim. Accordingly, Mitchell's motion to dismiss on this ground must be denied because the Election of Remedies doctrine does not bar Dr. Quarum's claim arising under Section 6(b).

---

[37] *See Quarum v. Mitchell Int'l, Inc.*, 2019 WL 158153, at *3-5 (Del. Ch. Jan. 10, 2019).

**C.** **Dr. Quarum adequately alleges damages flowing from Mitchell's purported breach of Section 6(c) of the Earnout Agreement.**

Finally, Mitchell argues Dr. Quarum has not and cannot plead damages resulting from Mitchell's alleged breach of Section 6(c) of the Earnout Agreement. Under Section 6(c)(ii), Mitchell was required to,

> within six (6) months after the Closing Date, . . . upgrade the existing bridge between [Mitchell's] SmartAdvisor system and build a new bridge to the DecisionPoint system, that will allow [QMedtrix] to provide the Solutions to [Mitchell's] customers that have agreed to use the Solutions and to calculate the Revenue and Net Margins generated from such customers in accordance with Appendix B[.][38]

Mitchell argues Dr. Quarum does not allege that the alternative bridge that Mitchell built to a different system was inferior to the bridges described in the Earnout Agreement, and does not allege that the alternative approach failed to "allow [QMedtrix] to provide the Solutions to [Mitchell's] customers that have agreed to use the Solutions[.]"[39] Mitchell therefore contends Dr. Quarum has not pleaded facts permitting a reasonable inference that the Sellers suffered any damages as a result of the alleged breach of Section 6(c).[40]

Dr. Quarum argues Count I contains well-pleaded allegations of damages resulting from Mitchell's breach of Section 6(c). Dr. Quarum references several allegations from the Second Amended Complaint, which "alone can support a

---

[38] Earnout Agreement § 6(c)(ii).
[39] *Id.*
[40] Def.'s Mot. to Dismiss 17-18.

reasonable inference that the substitute bridge to an unknown system is not an adequate substitute for both an upgraded bridge to SystemAdvisor or a new bridge to DecisionPoint[.]"[41]

Delaware law maintains a minimal pleading standard for breach of contract claims.[42] A plaintiff need not plead damages with precision or specificity.[43] The Second Amended Complaint alleges Mitchell "failed to upgrade the existing bridge between its SmartAdvisor computer system and build a new bridge to the DecisionPoint computer system," and therefore failed to perform its obligations under Section 6(c) of the Earnout Agreement.[44] Section 6(c) specifically states that upgrading the existing bridge and building a new bridge was necessary to provide the Solutions to customers and calculate the revenue and net margin generated from the customers, which then is used to calculate the earnout amount.

---

[41] Pl.'s Answering Br. 32-33.

[42] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)) ("The pleading standards governing the motion to dismiss stage of a proceeding in Delaware, however, are minimal. When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.").

[43] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003) ("In alleging a breach of contract, a plaintiff need not plead specific facts to state an actionable claim. Rather, a complaint for breach of contract is sufficient if it contains a short and plain statement of the claim showing that the pleader is entitled to relief. Such a statement must only give the defendant fair notice of a claim and is to be liberally construed.") (internal citations omitted).

[44] Second Am. Compl. ¶ 45.

17

It is reasonable to infer from the Second Amended Complaint's allegations and the contractual language that Dr. Quarum was damaged by the failure to build the specified bridge because he could not provide the Solutions to customers and/or could not accurately calculate the earnout amount. Accordingly, Mitchell's motion to dismiss on this ground must be denied because the allegations in the Second Amended Complaint permit a reasonable inference that Mitchell's purported breach of Section 6(c) of the Earnout Agreement damaged Dr. Quarum.

## CONCLUSION

For the foregoing reasons, Mitchell International's Motion to Dismiss Count I is **GRANTED** as to the alleged breach of Section 6(a) except as it relates to allegations of sabotage efforts and diverting customers; is **DENIED** as to the alleged breach of Section 6(b); and is **DENIED** as to the alleged breach of Section 6(c). **IT IS SO ORDERED.**

18