# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE HENNESSY CAPITAL | ) | |
| ACQUISITION CORP. IV | ) | C.A. No. 2022-0571-LWW |
| STOCKHOLDER LITIGATION | ) | |

## OPINION

Date Submitted: February 27, 2024
Date Decided: May 31, 2024

P. Bradford deLeeuw, DELEEUW LAW LLC, Wilmington, Delaware; Robert C. Schubert & Willem F. Jonckheer, SCHUBERT JONCKHEER & KOLBE LLP, San Francisco, California; *Counsel for Plaintiff Paul L. White Jr.*

Kevin R. Shannon, Christopher N. Kelly & Daniel M. Rusk IV, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; James W. Ducayet, Heather Benzmiller Sultanian & Thomas H. Collier, SIDLEY AUSTIN LLP, Chicago, Illinois; *Counsel for Defendants Daniel J. Hennessy, Greg Ethridge, Nicholas A. Petruska, Bradley Bell, Richard Burns, Juan Carlos Mas, Gretchen W. McClain, James F. O'Neil III, Peter Shea, Hennessy Capital Partners IV LLC & Hennessy Capital LLC*

**WILL, Vice Chancellor**

Among more memorable phenomena, 2020 and 2021 were marked by a special purpose acquisition company (SPAC) frenzy. Experienced investors and celebrities alike sponsored SPACs with the promise of huge returns. SPAC public stockholders believed they had unique exposure to private companies and the chance to redeem their investments at cost if presented with a bad deal. Hundreds of companies went public in record time through de-SPAC mergers.

As the dust of SPAC mania settled, a sobering picture emerged. Early-stage companies strained to adapt to the demands of being exchange listed and struggled to remain viable amid economic headwinds. The stocks of many de-SPACed companies fell well below the $10 initial public offering price—the same price available to redeeming stockholders. Some companies filed for bankruptcy.

Feeling duped, public stockholders who had not redeemed sought recourse through litigation. In the January 2022 *MultiPlan* decision, this court sought to ensure that the fiduciaries of a SPAC taking the Delaware corporate form fulfilled their duties to public stockholders. The court's focus was on the redemption right, which is a key protection so long as public stockholders can freely exercise it on an informed basis. These principles were confirmed in subsequent decisions where motions to dismiss were likewise denied under the entire fairness standard of review.

The success of a few cases begat a host of others. Though the SPAC market has contracted, SPAC lawsuits are ubiquitous in Delaware. Remarkably similar

1

complaints accuse SPAC directors of breaching their fiduciary duties based on flaws in years-old proxy statements that became problematic only when the combined company underperformed.

Poor performance is not, however, indicative of a breach of fiduciary duty. Conflicts are not a cause of action. And pleading requirements exist even where entire fairness applies.

The plaintiff, a SPAC public stockholder who chose not to redeem, has lost sight of these fundamentals. He asserts that the SPAC's sponsor and directors breached their fiduciary duties by touting an outdated business model that the target had decided to scrap. But his claims rest on post-closing developments. The two-step inference he asks me to draw—that the target made changes sooner and that the SPAC's board knew—is belied by the plaintiff's own allegations and the documents incorporated into his complaint.

Irrespective of the standard of review, the plaintiff has failed to plead a reasonably conceivable breach of fiduciary duty claim against the SPAC's fiduciaries. It cannot fairly be inferred that the defendants withheld knowable information material to public stockholders deciding whether to redeem or invest in the combined company. To allow this faulty claim to proceed would fuel perverse incentives and invite strike suits. The action is dismissed.

## I.  FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the plaintiff's Verified Supplemented Amended Class Action Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A.  Hennessy's Formation and Sponsor

In August 2018, Hennessy Capital Acquisition Corp. IV ("Hennessy") was formed as a Delaware corporation to function as a special purpose acquisition company.[2]  A SPAC is a publicly traded corporation intended to effectuate a business combination (or de-SPAC merger) with a private operating company that enables

---

[1] Verified Suppl. Am. Class Action Compl. (Dkt. 59) ("Compl."); *see City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 51 n.3 (Del. 2017) ("The Court of Chancery may [] rely on the allegations of the complaint and documents referred to or incorporated by reference.") (citation omitted); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002) ("The court may take judicial notice of facts publicly available in filings with the SEC.").  Citations in the form "Defs.' Opening Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Daniel M. Rusk, IV in Support of Defendants' Opening Brief in Support of Their Motion to Dismiss Plaintiff's Verified Amended Class Action Complaint.  Dkt. 19.  Citations in the form "Defs.' Reply Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Daniel M. Rusk, IV in Support of Defendants' Reply Brief in Support of Their Motion to Dismiss Plaintiff's Verified Amended Class Action Complaint.  Dkt. 26.  Certain exhibits were produced in response to a pre-suit demand under 8 *Del. C.* § 220.

[2] Compl. ¶ 67.

the target to go public.[3] Hennessy's certificate of incorporation set a deadline of 18 months to consummate a business combination or liquidate.[4]

Hennessy's sponsor was defendant Hennessy Capital Partners IV LLC (the "Sponsor").[5] Defendant Daniel J. Hennessy served as the SPAC's Chairman and Chief Executive Officer. He was also the managing member of defendant Hennessy Capital LLC ("Hennessy Capital") that was, in turn, the managing member of the Sponsor.[6] Hennessy was Daniel Hennessy's fourth (and not last) SPAC.[7]

At the SPAC's formation, the Sponsor purchased 7,187,500 Hennessy Class B shares (the "Founder Shares") for an aggregate purchase price of $25,000 (or $0.003 per share).[8] The Founder Shares would represent 20% of the SPAC's

---

[3] Prior decisions of this court detail the typical structure and governance features of a SPAC. *See In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784 (Del. Ch. 2022); *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692 (Del. Ch. 2023). The de-SPAC "merger" is technically a series of business combinations between the SPAC's merger subsidiaries and the target resulting in an operating company becoming a subsidiary of the SPAC. *MultiPlan*, 268 A.3d at 793 n.4.

[4] Compl. ¶ 8; *see also* Defs.' Opening Br. Ex. 1 ("Prospectus") 2. This deadline was later extended. Compl. ¶ 12.

[5] Compl. ¶¶ 5, 48.

[6] *Id.* ¶¶ 5, 39; *see also* Prospectus 1 (defining the "sponsor" as "Hennessy Capital Partners IV LLC, a Delaware limited liability company and an affiliate of Daniel J. Hennessy, [the] Chairman and Chief Executive Officer").

[7] Compl. ¶ 39.

[8] *Id.* ¶ 69; Prospectus 12-13.

outstanding shares after its initial public offering.[9]  If Hennessy completed a business combination, the Founder Shares would automatically convert to shares of Class A common stock on a one-for-one basis.[10]

Daniel Hennessy, through the Sponsor, selected the SPAC's initial directors and officers.  Hennessy's eight-member board of directors (the "Board") included Daniel Hennessy, President and Chief Operating Officer Greg Ethridge, and six outside directors (all defendants).[11]  Each Board member had an interest in the Sponsor and received an allocation of Founder Shares.[12]  Four of the outside

---

[9] Compl. ¶ 69; Prospectus 12-13.  The Complaint states it was the "expectation that such founder shares would represent 20% of the outstanding shares of H[ennessy] if and when [it] engaged in an initial business combination, as was its goal and purpose."  Compl. ¶ 69.  That is incorrect.  The prospectus refers to the expected Founder Share ownership percentage in Hennessy after the IPO—not after a business combination (at which point the ownership position of the Founder Shares would be significantly diluted).  *See* Prospectus 12-13; *see also* Compl. ¶¶ 69-70.

[10] Prospectus 12-13; *see also* Compl. ¶ 70.

[11] Prospectus 110.  These six outside directors are defendants Bradley Bell, Richard Burns, Juan Carlos Mas, Gretchen W. McClain, James F. O'Neil III, and Peter Shea.  Compl. ¶¶ 41-46.

[12] Compl. ¶ 7.  In October 2018, the Sponsor transferred 75,000 Founder Shares each of Bell, Burns, Mas, McClain, O'Neil, and Shea, 225,000 Founder Shares to Ethridge, and 300,000 Founder Shares to the SPAC's Executive Vice President, Chief Financial Officer, and Secretary Nicholas Petruska.  *Id.* ¶ 71; *see also* Prospectus 110.  Petruska served in a similar role with at least five other SPACs controlled by Daniel Hennessy.  He also serves as a Vice President of Hennessy Capital.  Compl. ¶ 47.  The Sponsor retained the bulk of the Founder Shares (5,656,820).  *Id.* ¶ 71; *see also* Prospectus 122 ("[Daniel] Hennessy may be deemed the beneficial owner of the founder shares held by our sponsor and has sole voting and dispositive control over such securities.").

5

directors had been appointed to boards of other SPACs formed by Daniel Hennessy.[13]

## B. Hennessy's IPO

Hennessy completed its IPO on March 5, 2019. It sold 30,015,000 units at $10 each for proceeds of $300,150,000.[14] The IPO proceeds were placed in a trust account.[15]

Each IPO unit consisted of one share of Hennessy Class A common stock and three quarters of one redeemable warrant entitling the holder to purchase one share of Class A common stock.[16] The prospectus issued in connection with the IPO explained that these shares were subject to different terms than the Founder Shares. Before any merger closed, public stockholders would have a right to redeem their Class A shares for approximately $10.10 each from the trust rather than invest in the proposed combined entity.[17] The Founder Shares, however, lacked a redemption right and were subject to lockup restrictions once they converted to Class A common

---

[13] Compl. ¶¶ 6, 40-42, 45-46.

[14] *Id.* ¶¶ 4, 72. This included 3,915,000 units issued pursuant to the full exercise of the underwriters' over-allotment option. *Id.* ¶ 72. The Complaint erroneously states that the units were sold at $10.10 per unit. *Id.* ¶¶ 4, 72; *see* Prospectus 128 ("Each unit has an offering price of $10.00[.]").

[15] Compl. ¶ 75.

[16] *Id.* ¶ 73; Prospectus 128.

[17] Prospectus 16, 20.

shares post-closing.[18]  If Hennessy failed to complete a merger by the 18-month deadline and liquidated, public stockholders would be reimbursed $10.10 per share from the trust while the Founder Shares expired worthless.[19]

The prospectus also disclosed that the Sponsor had agreed to purchase more than 11 million private placement warrants.[20]  Like the Founder Shares, these warrants would be valueless if the SPAC failed to timely merge.[21]  The prospectus noted that since the Sponsor and SPAC's directors and officers would "lose their entire investment" absent a merger, "a conflict of interest may arise in determining whether a particular business combination target is appropriate for [an] initial business combination."[22]

### C.    Legacy Canoo

On June 23, 2020—less than three months before the SPAC's initial merger window was set to close—representatives of Canoo Holdings Ltd. ("Legacy Canoo") contacted Hennessy about a potential business combination.[23]  Legacy

---

[18] *Id.* at 13-14, 123.

[19] *Id.* at 45, 48 ("The founder shares will be worthless if we do not complete an initial business combination."); *id.* at 25; Compl. ¶ 8.

[20] Compl. ¶ 74; Prospectus 15; *see also id.* at 1 (defining "private placement warrants" as "the warrants issued to our sponsor and our anchor investor in a private placement simultaneously with the closing of this offering").

[21] Compl. ¶ 76.

[22] Prospectus 48.

[23] Compl. ¶¶ 11, 81.

Canoo was an electric vehicle (EV) start-up company registered in the Cayman Islands.[24] Its business focused on a multi-purpose platform or "skateboard" vehicle design concept. The skateboard platform could theoretically support different cabin options called "top hats" using the same EV chassis.[25]

Hennessy's management team toured Legacy Canoo's headquarters and began due diligence in early July.[26] On July 14, Hennessy and its financial advisors participated in a due diligence session with Legacy Canoo to discuss the company's financial model.[27] On July 17, a non-binding letter of intent was executed.[28] Discussions continued into August.[29]

On August 16, Hennessy's Board approved a merger agreement with Legacy Canoo and voted to recommend that stockholders approve and adopt it.[30] Hennessy and Legacy Canoo executed the merger agreement the next day.[31]

---

[24] *Id.* ¶ 11.

[25] *Id.*; *see* Canoo, https://www.canoo.com/ (last visited May 6, 2024).

[26] Compl. ¶ 168 (quoting Defs.' Opening Br. Ex. 2 ("Proxy")).

[27] *Id.*; *see* Proxy 103.

[28] Compl. ¶ 168 (quoting Proxy).

[29] *Id.*

[30] *Id.*

[31] *Id.* ¶ 84; *see* Defs.' Opening Br. Ex. 3.

On August 18, Hennessy and Legacy Canoo jointly announced the merger agreement through a press release and conference call.[32]  An investor presentation attached to the press release described the company's three projected revenue streams: engineering services, business-to-consumer (or B2C), and business-to-business (or B2B).[33]  During the conference call, Legacy Canoo officers explained that the company's business model was phased according to these revenue streams.[34]

The first stream was described as revenue from EV "concept design and engineering services for auto [original equipment manufacturers] and other [s]trategics."[35]  Legacy Canoo's Chief Executive Officer Ulrich Kranz told investors that the engineering services business "already exist[ed]" and that the company was "already making money" from it.[36]  The business-to-consumer stream was anticipated to begin in 2022 and would involve a monthly subscription program for a "lifestyle vehicle."[37]  The business-to-business stream would start in with the release of "last-mile delivery vehicle.[38]  Together, these approaches gave the

---

[32] Compl. ¶¶ 85-86.

[33] *Id.* ¶¶ 88-91 (copying slides from investor presentation).

[34] *Id.* ¶ 87 (quoting conference call transcript).

[35] *Id.* ¶ 88 (copying slide from investor presentation).

[36] *Id.* ¶ 87 (quoting conference call transcript); *see also id.* ¶ 88.

[37] *Id.* ¶¶ 87, 88.

[38] *Id.*

company "very good flexibility" and the ability to "tap into different areas to be profitable."[39]

On October 20, 2020, Hennessy and Legacy Canoo announced that Tony Aquila had become Legacy Canoo's Executive Chairman.[40] Aquila was an investor in Legacy Canoo.[41]

## D. The Proxy Statement

On December 4, 2020, Hennessy issued a proxy statement recommending that its investors approve the merger with Legacy Canoo.[42] The proxy announced that a special meeting of Hennessy's stockholders would be held on December 21.[43] It also informed public stockholders that they had the opportunity to redeem their shares before the special meeting for $10.29 per share.[44]

The record date for the special meeting was October 27.[45] At that point, the aggregate market value of the Founder Shares was approximately $68.4 million, and the aggregate market value the Sponsor's private placement warrants was $16.7

---

[39] *Id.* ¶ 87.

[40] *Id.* ¶ 53.

[41] *Id.* ¶¶ 19, 53.

[42] *Id.* ¶ 13 (alleging that Hennessy's directors signed the proxy statement).

[43] Proxy 24; *see* Compl. ¶ 95.

[44] Proxy 223. There was an increase in the projected redemption value between the filing of the prospectus and the proxy, which accounts for the interest earned on the funds in the trust account. *Compare id.*, *with* Prospectus 20.

[45] Compl. ¶ 95.

million.[46]  Like the prospectus, the proxy disclosed the relationships among Hennessy's Sponsor, officers, and directors, and the economic incentives created by their Founder Shares.[47]

The proxy also described "positive factors" the Board had considered in selecting Legacy Canoo as a target, including Legacy Canoo's go-to-market strategy.[48]  It highlighted the company's anticipated revenue from the three prongs of its business plan.  Two—engineering services and business-to-consumer—are of note.

First, the proxy described Legacy Canoo's "B2B Engineering and Licensing Opportunities" from its contract engineering services segment.[49]  These opportunities included a "pipeline" for "EV concept design and engineering services for other [original equipment manufacturers], autonomous driving strategics, and high growth technology companies."[50]  The proxy said that Legacy Canoo had "already received significant interest in its skateboard technology . . . as [] exemplified by the announcement of an agreement between [Legacy] Canoo and

---

[46] *Id.* ¶ 96.

[47] *See, e.g.*, Proxy 9-10, 227-31, 243-44, 273.

[48] *Id.* at 107; *see* Compl. ¶ 98.

[49] Proxy 107; *see* Compl. ¶ 99.

[50] Compl. ¶ 99 (quoting Proxy 107).

11

Hyundai Motor Group for the co-development of a future EV platform."[51] It explained that the engineering services business provided "a unique opportunity to generate immediate revenues" before the company's first vehicles launched and supported "a projected $120 million of revenue in 2021."[52] It also noted that Legacy Canoo's engineering services offered "significant growth potential in the future" and "de-risk[ed] the overall business model."[53]

Second, the proxy discussed Legacy Canoo's business-to-consumer subscription business focused on lifestyle and sport vehicles.[54] The "subscription business model" was intended to provide the company "with a distinct opportunity for recurring revenue, a unique profit margin profile, and compelling return on equity."[55] The proxy disclosed statistics and research supporting use of the subscription model for these future vehicle releases.[56]

---

[51] *Id.*

[52] *Id.* (quoting Proxy 174).

[53] *Id.*

[54] *Id.* ¶ 100.

[55] *Id.* (quoting Proxy 169).

[56] *Id.* (quoting Proxy 179-80).

12

**E. New Canoo**

On December 21, 2020, 99.85% of Hennessy's stockholders voting approved the business combination.[57] Just 0.03% of Hennessy's public stockholders opted to redeem their shares, leaving $306.5 million in the trust account to contribute to Canoo.[58] The merger closed the same day as the vote. Hennessy changed its name to Canoo Inc.[59] The members of Hennessy's Board—other than Ethridge—resigned.[60] Daniel Hennessy and Ethridge also stepped down as officers.[61]

---

[57] *Id.* ¶ 17; *see* Defs.' Opening Br. Ex. 4 (Canoo Inc. Form 8-K, filed Dec. 21, 2020) 2.

[58] Compl. ¶ 105; *see* Proxy 90. Private investment in public equity investors contributed another $323 million. *See* Proxy 21, 90.

[59] Compl. ¶ 1.

[60] Defs.' Opening Br. Ex. 5 (Canoo Inc. Form 8-K, filed Dec. 22, 2020) 7.

[61] *Id.* at 7. Petruska also resigned. *Id.*

On March 26, 2021—three months after the de-SPAC transaction closed—Canoo's board received a presentation on the company's business strategy, financial performance, and investor relations.[62] Of Canoo's seven directors, only two (including Aquila) had worked for Legacy Canoo in any capacity.[63] The other five were Ethridge and "new directors."[64] Legacy Canoo's management, including CEO Kranz and CFO Paul Balciunas, were transitioning out of their roles.[65]

At the meeting, Aquila presented on Canoo's transition from a "3-year-old private company into a public company" including a "[l]eadership change" and a "[r]e-casting" of the company's "[v]ision and [s]trategy."[66] In a slide titled "Canoo's Business Model Needed a Reboot," Aquila explained that the approach Canoo "started with" was "complex," "[l]ack[ed] . . . [d]iligence," and caused it to compete against itself "through sale[s] of core IP to potential competitors."[67] He observed

---

[62] *See* Defs.' Opening Br. Ex. 6 (Mar. 26, 2021 Canoo board materials) ("Mar. 26 Materials"); Compl. ¶¶ 23-24, 121-31, 143 (discussing the Mar. 26 Materials).

[63] *See* Defs.' Opening Br. Ex. 7 (Canoo Inc. Form S-1, filed Jan. 13, 2021) 105-08; *see also* Compl. ¶ 106.

[64] Compl. ¶ 106.

[65] *Id.* ¶¶ 142-43.

[66] Mar. 26 Materials '058 (meeting agenda); *id.* at '063 (slide from Executive Chairman's update).

[67] *Id.* at '069 (slide from Executive Chairman's update).

14

that the business model Canoo "transitioned to" with a "[n]ew leadership team in place" created "[m]omentum in both B2B and B2C segments."[68]

After Aquila's update, outside consultant McKinsey & Company presented the results of its "External Analysis."[69] McKinsey's presentation was titled "Building a successful business model" and described its "[m]issions to date" during three time periods.[70] In September to October 2020, McKinsey had begun to "[a]ssess [Legacy] Canoo's initial economic model."[71] In October to November 2020, it "[i]dentif[ied] [the] most attractive segments to focus on."[72] In February to March 2021, it "[d]etermine[d] [the] location of Canoo's facilities."[73] McKinsey noted that "[c]ritical changes were made to Canoo's business model" based on its "subscription model insights," including "[d]e-emphasiz[ing] [the] role of [lifestyle vehicle] subscription[s]" and "[p]ivot[ing] from [a] subscription-led sales model to [an] outright sale led sales model."[74]

---

[68] *Id.*

[69] *Id.* at '058 (meeting agenda).

[70] *Id.* at '137, '139 (McKinsey slides); *see* Compl. ¶¶ 119, 121-22.

[71] Mar. 26 Materials '139; *see* Compl. ¶ 121 (quoting McKinsey slide).

[72] Mar. 26 Materials '139; *see* Compl. ¶ 121 (quoting McKinsey slide).

[73] Mar. 26 Materials '139; *see* Compl. ¶ 121 (quoting McKinsey slide).

[74] Mar. 26 Materials '142; *see* Compl. ¶ 125 (quoting McKinsey slide).

15

## F.  The Earnings Call

Three days later, on March 29, Canoo held an earnings call.[75]  Aquila announced that Canoo's board had decided to "deemphasize" the company's subscription model and engineering services business line, including the Hyundai Motor Group contract.[76]  During the question and answer portion of the call, Aquila was asked about moving away from engineering services and responded:

> We at the [b]oard really feel like the best thing to do is to accelerate our derivatives and focus our talent on creating IP for the company . . . .  And from my perspective, if I had been more involved earlier, certainly, once I invested and then I took the chairmanship, we started the analysis.  I had concerns about this . . . .  But to be a contract engineering house is just really not going to drive the best shareholder value.[77]

Aquila further explained that the subscription-based model was "not going away" but would be scaled back to "focus on something sub-20% of [Canoo's] sales."[78]

After several analysts expressed surprise at the shift, Aquila observed that Legacy Canoo's management had been "a little more aggressive than [he] would

---

[75] *See* Compl. ¶ 109.

[76] Defs.' Opening Br. Ex. 8 (Canoo Inc. earnings call transcript, dated Mar. 29, 2021) ("Earnings Call Tr.") at '651 ("Due to the expansion of our derivatives and the best return on capital, it was decided *by our board* to deemphasize the originally stated contract engineering services line.  This will further accelerate the creation of IP and the launch of our derivatives, which enhance our opportunity for the highest return on capital." (emphasis added)); *see* Compl. ¶¶ 111-13 (quoting earnings call transcript).

[77] Earnings Call Tr. '655; *see* Compl. ¶ 112.

[78] Earnings Call Tr. '662; *see* Compl. ¶ 118.

[have] be[en] in their [public] statements" and had lacked an "experienced public company team."[79] He said: "I wanted to go in a different direction based on the study we did. And with the [b]oard's help and observations, it kind of solidified that."[80]

### G. Post-Earnings Call Events

After the earnings call, Canoo's stock price dropped more than 21% to $9.30.[81] It recovered for a time before falling again in 2022.[82] As of August 18, 2023, Canoo stock closed at $0.44 per share.[83] Today, Canoo stock trades around $2.46 per share.[84]

Meanwhile, in late April 2021, Canoo disclosed that it was the subject of a "fact-finding inquiry" by the Securities and Exchange Commission (SEC).[85] The inquiry included Hennessy's IPO, the business combination, and historical movements in the company's "operations, business model, [and] revenues."[86]

---

[79] Earnings Call Tr. '663; *see* Compl. ¶ 116.

[80] Earnings Call Tr. '663; *see* Compl. ¶ 116.

[81] Compl. ¶ 161.

[82] *See* Nasdaq, GOEV Historical Data, https://www.nasdaq.com/market-activity/stocks/goev/historical (last visited May 30, 2024).

[83] Compl. ¶ 37.

[84] *See* Nasdaq, GOEV Historical Data, https://www.nasdaq.com/market-activity/stocks/goev/historical (last visited May 30, 2024).

[85] Compl. ¶ 144.

[86] *Id.* (quoting Canoo Inc. disclosures).

## H.  This Litigation

Plaintiff Paul White, a Canoo stockholder, obtained documents through a books and records demand before filing a putative class action complaint in this court on June 29, 2022.[87]  White purchased Hennessy shares before the record date associated with the merger and had the right to redeem his shares pre-closing.[88]  On December 21, 2022, he filed a four-count amended complaint that the defendants moved to dismiss.[89]  Oral argument on the motion was held on May 16, 2023.[90]

While I was preparing to issue a decision on the motion to dismiss, the plaintiff filed a "Request for Judicial Notice."[91]  He asked that I consider, among other things, the SEC's August 2023 filing of a Cease and Desist Order against Canoo and a complaint against former Legacy Canoo officers Kranz and Balciunas.[92]  He also moved under Court of Chancery Rule 15(d) to supplement his amended complaint with these developments.[93]

---

[87] Dkt. 1; *see* Compl. ¶ 1.

[88] Compl. ¶ 38.

[89] Dkts. 15, 19; *see also* Dkts. 24, 26.

[90] Dkts. 34-35.

[91] Dkt. 37.

[92] Dkt. 37.

[93] Dkt. 41.

On January 31, 2024, I permitted supplementation about "transactions or occurrences or events" happening since the amended complaint was filed.[94]  I denied the motion insofar as the plaintiff sought to "lift factual assertions" from the SEC documents "to bolster his pleading" about events that "transpired long before" the amended complaint was filed.[95]

On February 7, the plaintiff filed the operative Complaint.[96]  At my invitation, the parties each made a February 27 submission supplementing their prior motion to dismiss briefs to address the additions to the Complaint.[97]  The motion to dismiss was deemed submitted for decision at that time.

## II.    ANALYSIS

The defendants seek dismissal under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  The standard that governs their motion is as follows:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any

---

[94] Dkt. 57 (quoting Ct. Ch. R. 15(d)).

[95] *Id.*

[96] Dkt. 59.

[97] Dkts. 63, 64.

reasonably conceivable set of circumstances susceptible of proof."[98]

Although I "must draw reasonable inferences in favor" of the plaintiff, I am "not required to accept every strained interpretation of [his] allegations."[99] "[N]either inferences nor conclusions of fact unsupported by allegations of specific facts" must be "accepted as true."[100]

The plaintiff advances four counts. Counts I and II are breach of fiduciary duty claims against the former directors and "controllers" of Hennessy.[101] Count III is an unjust enrichment claim against the individual defendants.[102] And Count IV is an aiding and abetting claim against Hennessy Capital.[103]

Beginning with Counts I and II, I conclude that the plaintiff has failed to state reasonably conceivable breach of fiduciary duty claims. As a result, his unjust

---

[98] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citation omitted).

[99] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[100] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000)

[101] Compl. ¶¶ 194-210. The "Controller Defendants" are defined in the Complaint as Daniel Hennessy, the Sponsor, and Hennessy Capital. *Id.* ¶ 50. The "Director Defendants" are Daniel Hennessy, Ethridge, Bell, Burns, Mas, McClain, O'Neill, and Shea. *Id.* ¶ 51.

[102] *Id.* ¶¶ 211-14. The individual defendants are the director defendants plus Petruska. *Id.* ¶ 52.

[103] *Id.* ¶¶ 215-19.

20

enrichment and aiding and abetting claims also fail.  The Complaint is dismissed in its entirety.

## A.     The Breach of Fiduciary Duty Claims

In *In re MultiPlan Corp. Stockholders Litigation*, this court recognized that an impairment of public stockholders' redemption rights may give rise to a direct breach of fiduciary duty claim.[104]  The decision observed that features of founder shares compensating the SPAC's sponsors and fiduciaries—namely, the lack of liquidation and redemption rights—created an inherent conflict of interest.  Holders of founder shares received a unique benefit even from a value-destructive deal since they stood to make vast profits on a nominal investment.  Public stockholders, by contrast, stood to gain only if their returns from investing in the combined entity exceeded the $10 liquidation (and redemption) price.  As such, the entire fairness standard of review applied.[105]

The linchpin of *MultiPlan* was ensuring that a public stockholder's decision to redeem shares or participate in the merger be freely exercisable and fully informed.  Although the fiduciaries' misaligned interests implicated the duty of

---

[104] 268 A.3d 784 (Del. Ch. 2022).  A direct breach of fiduciary duty claim may also be premised on deficient disclosures in connection with the stockholder vote on the merger. "But, given the mechanics of a SPAC, the [redemption right] arguably takes on greater importance to stockholders." *Id.* at 802-03.

[105] *Id.* at 810-12.

21

loyalty, a claim premised solely on these conflicts would seemingly be non-viable if public stockholders had a fair opportunity to exercise their redemption rights.[106] The alleged unfairness of the de-SPAC transaction itself also could not support a direct claim, since corporate overpayment claims are classically derivative.[107]

Given these considerations, a *MultiPlan* claim is narrow. Breach of fiduciary duty claims against SPAC fiduciaries have nevertheless proliferated in the Court of Chancery while SPACs have languished.[108] Because many SPACs utilized the governance and compensation structure considered in *MultiPlan*, the court has

---

[106] *Id.* at 816 (considering that dismissal may be appropriate "[i]f public stockholders, in possession of all material information about the target, had chosen to invest rather than redeem"); *see also Laidlaw v. GigAcquisitions2, LLC*, 2023 WL 2292488, at *10 (Del. Ch. Mar. 1, 2023) ("If the Proxy had contained all material information needed for stockholders to make an informed redemption decision, dismissal might arguably be an appropriate outcome."); *GigAcquisitions3*, 288 A.3d at 722 n.207 (holding if the stockholder vote had been fully informed, "stockholders would . . . have been given a fair opportunity to redeem and there would not be a reasonably conceivable *MultiPlan* claim").

[107] *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1261 (Del. 2016) ("[C]laims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative."); *see also In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 768, 771-73 (Del. 2006) (affirming the dismissal claims under Rule 12(b)(6) for failure to demonstrate "harm caused to the shareholders individually" separate from harm to the company by overpayment in a merger); *cf. Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1274 (Del. 2021) (observing that "[t]he presence of a controller, absent more" does not change the fact that overpayment claims are "normally exclusively derivative because the *Tooley* test does not turn on the identity of the alleged wrongdoer").

[108] *See, e.g.*, Paul Kiernan, *SPAC Mania Is Dead. The SEC Wants to Keep It That Way*, WALL ST. J. (Jan. 24, 2024), https://www.wsj.com/finance/sec-wants-to-make-sure-spac-investors-know-what-theyre-getting-into-510aca30; *infra* note 109.

consistently applied entire fairness to similar claims.[109]  The abundance of SPAC

fiduciary duty claims suggests that stockholder plaintiffs have taken notice.

Entire fairness is not, however, a free pass to trial.  As Chancellor Allen

emphasized in *Solomon v. Pathe Communications Corp.*, "a plaintiff must do more

than allege that a transaction is a self-interested one in order to state a claim."[110]

Conclusory assertions that "the transaction is 'unfair' or 'coercive' or that disclosure

is 'inadequate'" cannot sustain a breach of fiduciary duty claim under any standard

of review.[111]

Even under the entire fairness standard, a complaint devoid of well-pleaded

allegations sufficient to establish the elements for a cause of action will be

---

[109] *E.g.*, *GigAcquisitions3*, 288 A.3d at 713-14; *GigAcquisitions2*, 2023 WL 2292488, at *7-9; *Newbold v. McCaw*, C.A. No. 2022-0439-LWW, at 21-23 (Del. Ch. July 21, 2023) (TRANSCRIPT); *In re XL Fleet (Pivotal) S'holder Litig.*, Consol. C.A. No. 2021-0808-KJSM, at 5 (Del. Ch. June 9, 2023) (TRANSCRIPT); *Malork v. Anderson*, C.A. No. 2022-0260-PAF, at 29-30 (Del. Ch. July 17, 2023) (TRANSCRIPT); *In re FinServ Acquisition Corp. SPAC Litig.*, C.A. No. 2022-0755-PAF, at 13-14 (Del. Ch. Nov. 1, 2023) (TRANSCRIPT); *Farzad v. Trasimene Cap. FT, LP II*, C.A. No. 2023-0193-JTL, at 61 (Del. Ch. Jan. 30, 2024) (TRANSCRIPT); *Newman v. Sports Acquisition Hldgs. LLC*, C.A. No. 2023-0538-LWW, at 14-16 (Del. Ch. May 28, 2024) (TRANSCRIPT).

[110] *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *6 (Del. Ch. Apr. 21, 1995) (explaining that a plaintiff cannot simply "weave[] together a tangle of conclusions about fairness and coercion, etc." to state a breach of fiduciary duty claim), *aff'd*, 672 A.2d 35 (Del. 1996); *see also Capella Hldgs, Inc. v. Anderson*, 2015 WL 4238080, at *5-6 (Del. Ch. July 8, 2015) ("Even when entire fairness scrutiny would otherwise seem to apply, a plaintiff must first 'make factual allegations in its complaint that, if proved, would establish that the challenged transactions are not entirely fair' to state a claim." (quoting *Monroe Cty. Emps.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010))).

[111] *Solomon*, 1995 WL 250374, at *4.

23

dismissed.[112]  These pleading requirements are enforced with "special care" in the context of representative litigation.[113]  "The court cannot be satisfied with mere conclusions, as it might, for example, in an auto-accident case, because in this sort of litigation the risk of strike suits means that too much turns on the mere survival of the complaint."[114]  SPAC suits are no exception.

To state a viable *MultiPlan* claim, a plaintiff is required to plead facts making it reasonably conceivable that conflicted fiduciaries deprived public stockholders of a fair chance to exercise their redemption rights.  If the impairment takes the form of disclosures, the facts must provide grounds to infer that the defendants made a

---

[112] *See HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2022 WL 3010640, at *21 (Del. Ch. July 29, 2022) (dismissing an entire fairness claim where the plaintiff failed to plead facts to support an inference of unfairness and noting that "the entire fairness standard of review" does not change "the pleading standard required by Rule 8 or Rule 12(b)(6)"); *see also Ravenswood Inv. Co., L.P. v. Winmill*, 2011 WL 2176478, at *4 (Del. Ch. May 31, 2011) (observing that although the defendants had the ultimate burden of demonstrating the entire fairness of a transaction, the plaintiff had "the burden of alleging facts that suggest the absence of fairness" at the pleading stage); *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015) ("[T]he mere fact that a plaintiff is able to plead facts supporting the application of the entire fairness standard to the transaction . . . does not relieve the plaintiff of the responsibility to plead a non-exculpated claim."); *Carlson*, 2010 WL 2376890, at *2 ("Delaware law is clear that even where a transaction between the controlling shareholder and the company is involved—such that entire fairness review is in play—plaintiff must make factual allegations about the transaction in the complaint that demonstrate the absence of fairness."); Ct. Ch. R. 8(a) (requiring a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief").

[113] *Solomon*, 1995 WL 250374, at *4.

[114] *Id.*; *see also Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 635 n.23 (Del. Ch. 2011) (addressing the importance of dismissing meritless claims due to "the substantial costs of discovery" and "the burdens to the judicial system"), *aff'd*, 76 A.3d 808 (Del. 2013).

material misstatement or omission—one affecting the total mix of information available to public stockholders deciding whether to redeem. The deficient disclosures are viewed in the context of the disloyal behavior that caused them, through the lens of the relevant equitable standard of review.[115] Still, specific factual allegations supporting a conclusion that the redemption right was impaired remain essential.[116]

The plaintiff nonetheless insists that the pleading standard is "relaxed" in the context of SPAC claims.[117] This misperception of his burden may explain the flaws in his claims. He cites a single impairment of the redemption right: allegedly false disclosures about Legacy Canoo's engineering services and subscription-based revenue streams.[118] But no well-pleaded facts support a reasonable inference that changes to Legacy Canoo's business model were known or knowable by Hennessy's Board before the merger closed. That is, no unfair dealing vis-à-vis the redemption right is pleaded. He has therefore failed to state a breach of fiduciary duty claim.

---

[115] *See GigAcquisitions3*, 288 A.3d at 714 (explaining that the plaintiff's allegations gave "rise to a single claim where the deficient disclosures [we]re 'inextricably intertwined' with the disloyal behavior that caused them").

[116] *See MultiPlan*, 268 A.3d at 816-17; *cf. Grobow v. Perot*, 539 A.2d 180, 187 n.6 (Del. 1988) (stating that the court need not accept "inferences nor conclusions of fact unsupported by allegations of specific facts").

[117] Tr. of Oral Arg. on Defs.' Mot. to Dismiss (Dkt. 35) ("Oral Arg. Tr.") 31.

[118] Compl. ¶¶ 164-68, 199, 208. He avers that the same inadequate disclosures in the proxy left the vote on the merger uninformed. This aspect of his claim overlaps with that focused on the redemption right. *See id.* ¶¶ 131, 200, 209.

### 1. Standard of Review

The entire fairness standard applies to the plaintiff's breach of fiduciary duty claims. This is so for two reasons. The Sponsor, which controlled Hennessy and its Board, allegedly received a unique benefit from its ownership of the Founder Shares and private placement warrants.[119] The terms of those securities created mismatched incentives relative to public stockholders' right to redeem.[120] A majority of the Board members were also purportedly conflicted due to their Founder Shares and service on other Hennessy-affiliated SPACs.[121] The defendants do not dispute the application of entire fairness.

"The concept of fairness has two basic aspects: fair dealing and fair price."[122] Entire fairness review considers various indicia of fair dealing including a transaction's "timing and initiation, structure, negotiations and approval."[123] Fair price "relate[s] to the economic and financial considerations of the [transaction], including all relevant factors."[124] "The fact intensive nature of this inquiry 'normally

---

[119] *See* Compl. ¶ 10.

[120] *See MultiPlan*, 268 A.3d at 810 (recognizing misaligned incentives where founder shares and private placement warrants would become worthless if the SPAC did not timely close a merger); *GigAcquisitions3*, 288 A.3d at 717-18 (same).

[121] Compl. ¶¶ 71, 156-58.

[122] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[123] *In re BGC P'rs, Inc. Deriv. Litig.*, 2022 WL 3581641, at *18 (Del. Ch. Aug. 19, 2022) (describing the *Weinberger* factors), *aff'd*, 303 A.3d 337 (Del. 2023).

[124] *Weinberger*, 457 A.2d at 711.

will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss.'"[125] "Even in a self-interested transaction," though, a plaintiff "must allege some facts that tend to show that the transaction was not fair."[126]

In the context of a direct claim under *MultiPlan*, the transaction to be analyzed is the exercise of the right to redeem. The fairness of the de-SPAC merger is not the focus. If it were, the claim would likely be derivative and subject to the requirements of Rule 23.1.[127] The direct nature of a claim premised on the redemption right does not give stockholders license to bypass the threshold demand requirement and challenge a SPAC's overpayment for a target.[128]

---

[125] *GigAcquisions3*, 288 A.3d at 722 (quoting *Orman v. Cullman*, 794 A.2d 5, 21 n.36 (Del. Ch. 2002)).

[126] *Solomon*, 1995 WL 250374, at *5; *see id.* at *6 (holding that the plaintiff's allegations that "the transaction was a self-dealing one" that was "ill-informed, coercive, grossly unfair, etc." is "insufficient to state a claim"); *see also Carlson*, 2010 WL 2376890, at *1-2 (noting that "[t]ransactions between a controlling shareholder and the company are not per se invalid under Delaware law" but are "perfectly acceptable if they are entirely fair, and so plaintiff must allege facts that demonstrate a lack of fairness"); *In re Boston Celtics Ltd. P'ship S'holders Litig.*, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999) ("In the context of a challenge to the fairness of certain transactions, such as the cash-out merger of minority limited partners by a majority limited partner, it also is necessary for the plaintiff to allege specific items of misconduct that demonstrate unfairness, in order to survive a motion to dismiss.").

[127] *See supra* note 107 and accompanying text.

[128] *See* Ct. Ch. R. 23.1; *White v. Panic*, 783 A.2d 543, 550–51 (Del. 2001). There are lingering questions about the feasibility of a derivative cause of action on behalf of a SPAC challenging a de-SPAC transaction. I need not venture into that legal thicket today.

As a result, fair dealing in this context considers whether public stockholders were free to redeem without interference from conflicted fiduciaries. Specific facts reflecting that the redemption right was frustrated by a SPAC's sponsor or directors, who were motivated to pursue a value-decreasing deal while minimizing redemptions, could indicate unfairness. In the cases considered to date, unfair dealing allegations concern failures to provide stockholders with information needed to make an informed redemption decision.[129] The analysis is not one of materiality alone since the "reasonable availability" of information requires the court to assess whether "directors have undertaken a sufficient inquiry for material information."[130] Regarding fair price, unfairness has been inferred from contentions "that public stockholders were left with shares of [the combined company] worth far less than the $10 per share redemption price."[131]

---

[129] *Weinberger*, 457 A.2d at 711 (discussing inadequate disclosures as one aspect of a fair dealing analysis). A creative mind can imagine other examples.

[130] *GigAcquisitions3*, 288 A.3d at 726-27 (discussing that the phrase "reasonably available" is "not meaningless" but "sets out a baseline expectation that directors have undertaken a sufficient inquiry for material information" (quoting *Pfeffer v. Redstone*, 965 A.2d 676, 686 (Del. 2009))).

[131] *Id.* at 728.

## 2. The Plaintiff's Allegations

Many of the plaintiff's assertions relate to the fairness of the overall business combination.[132] He has not pleaded demand futility and purports to bring direct claims. Accordingly, I focus on his allegations regarding the redemption right.

On fair price, the plaintiff avers that Canoo's shares traded below $10 after Aquila revealed the revised business plan to the market in March 2021.[133] Although a finding of unfair price (not to mention damages) may prove an unobtainable— especially since Canoo's stock price recovered and traded around $10 per share for months—this allegation is arguably enough at the pleading stage. If crucial information was withheld when redemption rights were available and caused a loss of public stockholders' investments when revealed, an unfair price is reasonably inferable.

On fair dealing, the plaintiff has gone all in on his argument that Hennessy's Board and Sponsor breached their fiduciary duties by failing to disclose McKinsey's engagement and changes to Legacy Canoo's business model.[134] He disavows any other basis for claiming that stockholders were unable to make a fair redemption

---

[132] *See e.g.*, Compl. ¶¶ 161, 197, 205-07, *see also El Paso*, 152 A.3d at 1261; *supra* note 107 and accompanying text.

[133] Compl. ¶¶ 37, 161.

[134] *See* Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss (Dkt. 24) ("Pl.'s Answering Br.") 45; Compl. ¶¶ 164-67, 172, 176, 181.

choice.[135]  This position is fatally flawed.  The plaintiff relies on post-closing developments, strained inferences, and documents that contradict his theories.  He has failed to state a reasonably conceivable claim.[136]

### a.  The Business Plan Allegations

The plaintiff argues that Hennessy's public stockholders were harmed because the Proxy neglected to disclose the "overhaul" of Legacy Canoo's business plan following McKinsey's assessment of its "initial economic model."[137]  The Proxy made optimistic statements about Legacy Canoo's forecasted revenue from engineering services and subscription sales.  These statements and forecasts were false, according to the plaintiff, because Legacy Canoo had abandoned its contract engineering services business and pivoted away from a subscription-based model by December 2020.[138]

The plaintiff likens this claim to others where the Court of Chancery has denied motions to dismiss direct claims against former SPAC fiduciaries.[139]  In those

---

[135] Oral Arg. Tr. 52 ("The Court: Is that the sole impairment of the redemption right that you're alleging concerning the disclosures about the business plan and McKinsey? Counsel: That's correct.").

[136] *See Carlson*, 2010 WL 2376890, at *2 (dismissing claims that the parties agreed were reviewable under entire fairness where the plaintiff made only conclusory assertions regarding unfair price).

[137] Pl.'s Answering Br. 6 (quoting Compl. ¶¶ 120-21); *see id.* at 23-26; Compl. ¶ 138.

[138] *See* Compl. ¶¶ 13-26, 116, 127, 150, 161-62, 166, 181.

[139] *See* Pl.'s Answering. Br. 31-32.

cases, purportedly disloyal directors were accused of withholding knowable information material to an informed redemption choice. There are, however, critical distinctions from the present matter that mandate a different outcome.

In *Delman v. GigAcquisitions3, LLC*, this court considered a claim that a SPAC's directors breached their fiduciary duties by failing to disclose that the target's business would be difficult to scale.[140] "The nature of [the target's] business was 'knowable' through the sort of diligence and analysis expected of the board of a Delaware corporation undertaking a major transaction."[141] The complaint also alleged that the SPAC's directors "had good reason to question [the target's] future capabilities."[142] The defendants failed to disclose (or failed to investigate) these issues, despite disclosing a projected revenue increase of over 22,100% in five years.[143]

Similarly, in *MultiPlan*, a SPAC "disclosed that [the target] was dependent on a single customer—its largest—for 35% of its revenues."[144] The proxy statement for the planned merger was silent on the customer's intention "to create an in-house

---

[140] 288 A.3d at 727.

[141] *Id.*

[142] *Id.* at 726.

[143] *Id.*

[144] 268 A.3d at 797.

data analytics platform" that would directly compete with the target.[145] The customer had publicly announced it would move its key accounts from the target to the customer's own platform within two years.[146] As a result, it was reasonably conceivable that the defendants knew revenue from this customer would evaporate and failed to disclose it.[147]

In these cases (and others since), concrete facts about the merger target's prospects were kept from public stockholders.[148] The information was known or knowable by directors and officers acting consistent with their fiduciary duties. It also would have been material to stockholders deciding whether to redeem their shares or invest in the post-de-SPAC entity. As a result, the court found it reasonably conceivable that the opportunity to redeem was not the product of fair dealing.

---

[145] *Id.*

[146] *Id.* at 797-98.

[147] *Id.* at 816.

[148] *E.g.*, *Newbold*, C.A. No. 2022-0439-LWW, at 26-29 (denying a motion to dismiss a claim that a SPAC's directors "painted an overly rosy picture of Astra's development forecast" based on payload capacity goals for its rockets despite having information that Astra had significantly altered its payload goal); *Malork*, C.A. No. 2022-0260-PAF, at 32-40 (denying a motion to dismiss a claim where it was reasonably conceivable that the defendants' disclosures concerning customer relationships, contracts, and the legacy company's financial projections were materially misleading and did not represent what the defendants knew at the time); *Newman*, C.A. No. 2023-0538-LWW, at 24 (denying a Rule 12(b)(6) motion where optimistic disclosures about an online gaming company's prospects did not reflect negative effects of known regulatory changes in major markets).

No such material facts that were known or knowable by the defendants are raised here. The Complaint instead addresses actions by Canoo's post-closing board—a body made up of directors who were (with one exception) not on Hennessy's Board.[149] It cannot reasonably be inferred that Hennessy's directors were aware that Legacy Canoo's business model would change in the future.

The plaintiff primarily relies on the March 2021 Canoo board materials to bolster his contention that Legacy Canoo abandoned its contract engineering services business before the merger closed. He hones in on the use of the past tense in a few slides, arguing that it supports an inference that the decision to revamp the business preceded December 2020.[150] McKinsey's presentation, for example, reports that "[c]ritical changes *were* made to Canoo's business model."[151] Another slide stated that the business model "needed a reboot" and suggested the company had "transitioned" to a new one.[152]

But the Complaint and documents it incorporates belie any reasonable inference that Legacy Canoo's business plan changed pre-closing. The Complaint

---

[149] Proxy 246-49. Only two of Canoo's directors were on the Legacy Canoo board. *Supra* note 63 and accompanying text.

[150] *See* Pl.'s Answering Br. 25, 36, 39; Oral Arg. Tr. 43 (plaintiff's counsel explaining that the use of the past tense in McKinsey's slides was the "primary" basis for an inference that material conclusions were reached pre-closing).

[151] Compl. ¶ 125 (quoting Mar. 26 Materials '142) (emphasis added).

[152] *Id.* ¶¶ 24, 128 (quoting Mar. 26 Materials '069).

states that McKinsey began its work in September 2020.[153]  It observes that McKinsey's first step in September to October was "assess[ing] Canoo's initial economic model."[154]  "[O]nce [Aquila] invested and . . . took the chairmanship" in October, Legacy Canoo "started" its analysis and Aquila developed concerns about the company's direction.[155]  In October to November, McKinsey "[i]dentif[ied] [the] most attractive segments to focus on."[156]  The business plan transition was subsequently made with a "[n]ew leadership team in place."[157]  Indeed, the Complaint highlights that during the March 29, 2021 earnings call, Aquila said that the decision to "deemphasize the originally stated contract engineering services lines" was made with the input of Canoo's board.[158]

---

[153] *Id.* ¶ 121 ("McKinsey partners Rock Khanna and Philipp Kampshoff prepared the study and began their work sometime in or before September 2020."); *see also id.* ¶ 119 ("[S]ometime in or before September 2020—months before the proxy statement and Merger vote—Legacy Canoo commissioned a study from the consulting firm McKinsey & Co. titled 'Building a successful business model.'").

[154] *Id.* ¶ 23 (quoting Mar. 26 Materials '139).

[155] *Id.* ¶ 134 (quoting Earnings Call Tr. '655).  The plaintiff suggests that Daniel Hennessy's public expression of pleasure that Aquila was joining Legacy Canoo as Executive Chairman in October 2020 "confirm[s] their close ties."  Pl.'s Answering. Br. 15-16 (quoting Compl. ¶ 175).  This does nothing to suggest that Daniel Hennessy had reason to know Aquila's personal views on Legacy Canoo's business plan.

[156] Compl. ¶ 23 (quoting Mar. 26 Materials '139).

[157] Mar. 26 Materials '069.

[158] Compl. ¶¶ 109-11; Earnings Call Tr. '651, '663; *see supra* notes 76-80 and accompanying text.

34

Taken together and as true, these allegations indicate that McKinsey may have reached early recommendations about aspects of the company's business in the fall, that its work was ongoing when the merger closed in December 2020, and that Aquila—at some point—developed concerns about the business. Delaware law does not, however, require the disclosure of preliminary analyses and discussions.[159] For good reason. To require an unadopted, interim analysis to be disclosed would invite speculation about matters that may never solidify.[160] To the extent the plaintiff claims that the proxy needed to disclose McKinsey's retention, he cites no law suggesting that the ongoing engagement of a target's outside advisor is material to an acquiror's stockholders.[161]

---

[159] *See Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 145 (Del. 1997) (stating that public companies are not required to disclose "speculat[ion] about its future plans"); *see also Red Oak Fund, L.P. v. Digirad Corp.*, 2013 WL 5740103, at *16-17 (Del. Ch. Oct. 23, 2013) (finding no disclosure violation where directors allegedly failed to disclose that management "had already 'analyzed and evaluated' whether to implement" a plan but the board had not "voted or in some other way decided to adopt [it]"); *Hewlett v. Hewlett-Packard Co.*, 2002 WL 818091, at *11 (Del. Ch. Apr. 30, 2002) ("There is no reason for management to disclose preliminary reports that are generated early in a planning process, based on imperfect information[.]"). *In re Columbia Pipeline Gp., Inc.*, 2017 WL 898382, at *5 (Del. Ch. Mar. 7, 2017) ("As a matter of Delaware law, a board does not have a fiduciary obligation to disclose preliminary discussions, much less an analysis of preliminary discussions.").

[160] *See, e.g.*, *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994) ("Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders."); *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *13 (Del. Ch. Nov. 30, 2007) (explaining that a plaintiff's criticisms based on unreliable or "misleading" information "do not constitute a sufficient basis for a breach of disclosure claim").

[161] *See* Compl. ¶¶ 25, 140, 176, 183.

The plaintiff next argues that Legacy Canoo must have already "abandoned" its engineering services business before the merger because no revenue from that line was recorded in the fourth quarter of 2020.[162] This assertion is missing from the Complaint.[163] It is also inconsistent with the plaintiff's timing theory.[164] On the one hand, the plaintiff claims that changes to Legacy Canoo's business were based on McKinsey's analysis in September and October 2020.[165] On the other hand, he maintains that the purported failure to recognize contract revenue means that an "enormous shift in strategy occurred before September 30" when McKinsey began its work.[166] Both cannot be true.

These deficiencies alone cause the plaintiff's claim to fall short of the reasonable conceivability standard.[167] But there is more. Even if I credited the bare

---

[162] Pl.'s Answering Br. 37-38. The plaintiff's argument also misapplies accounting principles. As explained in the company's SEC filings, consistent with GAAP, Legacy Canoo recognized revenue only when it "satisfie[d] the performance obligations" of an engineering services contract. Defs.' Reply Br. Ex. 9 (Canoo Inc. Form S-1, filed Jan. 13, 2021 (Notes to Condensed Consolidated Financial Statements)) F-33.

[163] *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *5 (Del. Ch. May 5, 2010) (stating that a plaintiff "is bound to the factual allegations contained in [his] complaint," and "cannot supplement [his] complaint through [his] brief"); *see also Malpiede*, 780 A.2d at 1082 ("[A] motion to dismiss under Chancery Rule 12(b)(6) must be decided . . . assum[ing] as true the well-pleaded allegations in the complaint.").

[164] Pl.'s Answering Br. 37-38.

[165] *Id.* at 23-24, 36.

[166] *Id.* at 6.

[167] *See Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (declining "to accept conclusory allegations unsupported by specific facts or to draw unreasonable inferences in favor of the non-moving party"), *overruled on other grounds by Ramsey v.*

allegation that Legacy Canoo's business shifted pre-closing, there are no facts from which I could fairly infer knowledge by Hennessy's Board. The assertion that an acquiror's board "must have known" about a target's nascent internal analysis is strained.[168]

The plaintiff implores me to overlook the flaws in his pleading by characterizing them as "fact-based" matters that cannot be resolved on a motion to dismiss.[169] Yet it is his burden to plead some facts indicating unfairness. Given the nature of his claim, he must sufficiently allege that Legacy Canoo decided to materially reconfigure its business model before the merger closed and that the decision was knowable by Hennessy's Board. He has not done so.

### b. The SEC Documents

In the third iteration of his Complaint, the plaintiff cites to SEC documents concerning alleged wrongdoing by Legacy Canoo. These documents include a federal securities suit against two former Legacy Canoo officers (Kranz and Balciunas) and a Cease and Desist Order against Canoo. They detail contradictions

_____

*Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003) ("Under Rule 12(b)(6), a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations.").

[168] Compl. ¶¶ 33, 162; *see Pfeffer*, 965 A.2d at 687 (requiring "well-pleaded facts from which it can be reasonably inferred that [the omitted fact] was knowable and that the defendant was in a position to know it" (citation omitted)).

[169] Pl.'s Answering Br. 38-39.

between Legacy Canoo's disclosed revenue projections and setbacks affecting its engineering services business.[170] The plaintiff maintains that these documents bolster his claim that Hennessy public stockholders' redemption rights were impaired.

None of the plaintiff's allegations about the SEC documents support a reasonably conceivable breach of fiduciary duty claim against Hennessy's Board or Sponsor. As a procedural matter, the plaintiff was permitted to supplement his prior complaint to add the fact of the SEC-related developments.[171] To the extent that the SEC's conclusions are fully incorporated into the plaintiff's substantive allegations, they undermine his breach of fiduciary duty claims.[172]

The SEC documents could perhaps support an inference that Legacy Canoo officers misrepresented the strength of the company's projected contract engineering

---

[170] Compl. ¶¶ 146-55; *see also id.* Ex. A (Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order) ("Cease and Desist Order"); *id.* Ex. B (Compl. and Jury Demand, *S.E.C. v. Kranz et al.*, No. 23-CV-06332 (C.D. Cal. 2023)) ("SEC Compl.").

[171] Dkt. 57; *see* Ct. Ch. R. 15(d) ("[T]he Court may . . . permit the [plaintiff] to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented.").

[172] To the extent that the documents are incorporated by refence, they must be considered "as a whole 'to ensure that the plaintiff has not misrepresented [their] contents and that any inference the plaintiff seeks to have drawn is a reasonable one.'" *Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *8 (Del. Ch. Jan. 31, 2023) (citation omitted).

38

revenue.[173] But the documents make it unreasonable to infer that Hennessy's directors and officers knew or could have known about these issues. The plaintiff quotes the SEC's allegation that Legacy Canoo and its officers were obligated to but "did not communicate the negative engineering updates or their associated negative impact on 2021 and 2022 projected revenue to [Hennessy]."[174] The Cease and Desist Order goes further, concluding that Legacy Canoo actively "[c]oncealed [m]aterial [i]nformation from [Hennessy]" about engineering services prospects by presenting it with false revenue projections.[175] I cannot conclude that the plaintiff has stated a claim for breach of fiduciary duty against Hennessy fiduciaries for failing to disclose information that was kept from them.[176]

*        *        *

---

[173] *See, e.g.*, Cease and Desist Order ¶¶ 1, 11, 15, 20; SEC Compl. ¶¶ 28-41.

[174] Compl. ¶ 154; *see id.* ¶ 155.

[175] SEC Cease and Desist Order ¶ 21 ("Pursuant to § 7.01(d) of the merger agreement between Canoo and the SPAC Company, Canoo was required to 'promptly inform [Hennessy]' of any material fact included in the registration statement that was no longer true. Despite this, Canoo did not communicate the negative engineering updates or their associated negative impact on 2021 and 2022 projected revenue to [Hennessy].").

[176] *See In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2011 WL 227634, at *6 (Del. Ch. Jan. 14, 2011) (explaining that directors do "not owe a duty to disclose facts that they [were] not aware of"); *see also Malpiede*, 780 A.2d at 1088 (stating that "[a]bsent some indication" that the board knew a fact, "the board did not have a duty to disclose"). The plaintiff's allegations stand in stark contrast to the sort of knowable facts that faithless fiduciaries purportedly failed to uncover in prior decisions. *See supra* notes 140-48 and accompanying text (discussing *GigAcquisitions3* and others).

The plaintiff has failed to plead a reasonably conceivable claim under *MultiPlan*. He chose to focus on a single purported impairment of the redemption right, which is deficient for multiple reasons. His conclusory assertion that the transaction was conflicted is also insufficient to show unfairness concerning the right to redeem.[177] To allow these claims to proceed would serve only to launch "an extensive, litigious fishing expedition for facts through discovery in the hope of finding something to support them."[178] Accordingly, Counts I and II of the Complaint are dismissed.

## B. The Unjust Enrichment Claim

The plaintiff advances an unjust enrichment claim against the individual officer and director defendants. Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against

---

[177] *See Solomon*, 1995 WL 250374, at *5 (dismissing a breach of fiduciary duty claim after finding that the plaintiff "simply alleged that the transaction was a self-dealing one" in "conclusory fashion," which was "insufficient to state a claim"); *Capella*, 2015 WL 4238080, at *5 (dismissing a breach of fiduciary duty claim because there were no "well-pleaded allegations about the unfairness of the transaction"); *see also In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *2 (Del. Ch. Oct. 17, 2007) ("An allegation is conclusory when it merely states a generalized conclusion with no supporting facts. For example, the bald assertion that '[an alleged controlling stockholder] ultimately controls virtually every aspect of [a company's] operations and profitability in a manner designed to maximize [the controlling stockholder's] own financial condition' is conclusory."), *aff'd sub nom. Int'l Brotherhood Teamsters v. Coca-Cola Co.*, 954 A.2d 910 (Del. 2008) (TABLE).

[178] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 980 (Del. Ch. 2000) (quoting *Nebenzahl v. Miller*, 1996 WL 494913, at *3 (Del. Ch. Aug. 26, 1996)).

the fundamental principles of justice or equity and good conscience."[179]  To plead a claim for unjust enrichment, the plaintiff must allege: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, [and] (4) the absence of justification."[180]  It is "established law that an unjust enrichment claim should be dismissed if it duplicates a breach of fiduciary duty claim."[181]

The plaintiff's unjust enrichment claim is entirely premised on his breach of fiduciary duty claims.[182]  According to the Complaint, the individual defendants were unjustly enriched because they profited from the de-SPAC while "breach[ing] their fiduciary duties" to public stockholders.[183]  Because the plaintiff has failed to state a breach of fiduciary duty claim, he has also failed to state an unjust enrichment claim.[184]  Count III is dismissed.

---

[179] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citation omitted).

[180] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 875 (Del. 2020) (citation omitted).

[181] *Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 680 (Del. 2020); *see Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014) ("The Court frequently treats duplicative fiduciary duty and unjust enrichment claims in the same manner when resolving a motion to dismiss.").

[182] The plaintiff asserts only an unjust enrichment claim (i.e., no breach of fiduciary duty claim) against defendant Petruska.  There is no allegation that Petruska breached any duty to Hennessy stockholders.  The claim against Petruska fails for that additional reason.

[183] Compl. ¶¶ 212-13.

[184] *See In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *35 (Del. Ch. May 25, 2021) (dismissing unjust enrichment claim where plaintiffs did not adequately plead that a proxy

41

## C. The Aiding and Abetting Claim

Finally, the plaintiff brings a claim against Hennessy Capital for aiding and abetting breaches of fiduciary duty. To state this claim, he "must allege facts that satisfy the four elements of an aiding and abetting claim: '(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the breach."[185] The claim falls short on at least the second and third elements.

First, the plaintiff has failed to state a breach of fiduciary duty claim. His aiding and abetting claim must therefore be dismissed because "a claim for aiding and abetting a breach of fiduciary duty cannot survive if the underlying fiduciary duty claims do not."[186]

Second, the Complaint lacks adequate allegations that Hennessy Capital knowingly participated in any purported breach of fiduciary duty. The Complaint alleges that Hennessy Capital was the vehicle through which Daniel Hennessy

---

statement was misleading), *aff'd in part, rev'd in part on other grounds*, 282 A.3d 37 (Del. 2022); *Urdan*, 244 A.3d at 680 (affirming the Court of Chancery's decision to dismiss plaintiffs' unjust enrichment claim where it was duplicative of their breach of fiduciary duty claim).

[185] *Malpiede*, 780 A.2d at 1096 (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)).

[186] *City of Miami Gen. Emps. v. Comstock*, 2016 WL 4464156, at *23 (Del. Ch. Aug. 24, 2016), *aff'd*, 158 A.3d 885 (Del. 2017); *see also In re Alloy, Inc.*, 2011 WL 4863716, at *14 (Del. Ch. Oct. 13, 2011) (same); *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 2006 WL 1494360, at *5 (Del. Ch. May 24, 2006) (same).

"controlled" the Sponsor.[187]  It also states that the SPAC structure created financial incentives for the Sponsor and, by extension, Hennessy Capital as the Sponsor's managing member.[188]  But there are no allegations whatsoever that Hennessy Capital took action with regard to the merger or proxy.

This deficiency persists even if Daniel Hennessy's alleged knowledge is imputed to Hennessy Capital.[189]  There are, of course, allegations that Daniel Hennessy participated in the purported wrongdoing.  The Complaint is silent, though, regarding actual participation by Hennessy Capital.  The bare statement that Hennessy Capital was involved in the alleged breaches of fiduciary duty are insufficient.[190]

The plaintiff again analogizes to *MultiPlan*, where this court sustained an aiding and abetting claim against a financial advisor owned by the controlling stockholder.[191]  The financial advisor allegedly received $30.5 million from the SPAC in exchange for consulting services related to the transaction at issue.  Unlike

---

[187] Compl. ¶ 5.

[188] *Id.* ¶¶ 6-10.

[189] Pl.'s Answering Br. 51.

[190] *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 392 (Del. Ch. 1999) ("Mere conclusory statements devoid of factual details to support an allegation of knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss."); *see also Lukens*, 757 A.2d at 734-35 ("Knowing participation . . . must be reasonably inferred from the facts alleged in the complaint.").

[191] Pl.'s Answering Br. 51; *see MultiPlan*, 268 A.3d at 818.

Hennessy Capital, it was alleged to have actively participated in challenged conduct alongside the SPAC's fiduciaries. Here, Hennessy Capital is only alleged to have received a financial benefit through the Sponsor.[192] Count IV is dismissed.

## III. CONCLUSION

For the above reasons, the defendants' motion to dismiss is granted. The plaintiff has failed to state reasonably conceivable claims. The Complaint is dismissed with prejudice under Rule 12(b)(6).

---

[192] *See Malpiede*, 780 A.2d at 1098 (affirming the dismissal of an aiding and abetting claim where there were no facts pleaded that the alleged aider and abettor "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue").

44